# United States Court of Appeals
## For the First Circuit

No. 07-1931

UNITED STATES OF AMERICA,

Appellee,

v.

RODRIGO CAMPUSANO,

Defendant, Appellant.

_____

No. 07-2442

UNITED STATES OF AMERICA,

Appellee,

v.

JAIME PINILLOS,

Defendant, Appellant.

_____

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Carmen Consuelo Cerezo, U.S. District Judge]

_____

Before
Boudin, Siler* and Howard,
Circuit Judges.

_____

Johnny Rivera-Gonzalez, by appointment of the court, for
appellant Rodrigo Campusano.
Angela G. Lehman, by appointment of the court, for appellant
Jaime Pinillos.

_____

*Of the Sixth Circuit, sitting by designation.

German A. Rieckehoff, Assistant United States Attorney, with whom Rosa Emilia Rodriguez-Velez, United States Attorney, and Nelson Pérez-Sosa, Assistant United States Attorney, Chief, Appellate Division, were on brief for appellee Rodrigo Campuzano.

Luke Cass, Assistant United States Attorney, with whom Rosa Emilia Rodriguez-Velez, United States Attorney, and Nelson Pérez-Sosa, Assistant United States Attorney, Chief, Appellate Division, were on brief for appellee Jaime Pinillos.

---

February 13, 2009

---

**BOUDIN**, <u>Circuit Judge</u>.   Jaime Pinillos and Rodrigo Campusano were tried together in the district court for drug offenses and convicted.  The convictions were upheld, <u>United States</u> v. <u>Pinillos-Prieto</u>, 419 F.3d 61 (1st Cir. 2005), but both cases were remanded for resentencing in light of <u>United States</u> v. <u>Booker</u>, 543 U.S. 220 (2005).  Both men have separately appealed from their reinstated sentences and we resolve both appeals in this decision.

Early in 2001, Pinillos met in Colombia with Nelson "Rafa" Rodriguez, who he understood to be a drug dealer; unknown to Pinillos, Rafa was an experienced government informant.  After the initial contact, Pinillos called Rafa from Miami, saying that he had a customer who wanted to buy 100 kilograms of cocaine, and could afford the purchase price--approximately $1.4 million, or $13,500 per kilo.

Rafa arranged to meet Pinillos at a bakery in Isla Verde, Puerto Rico, to finalize the sale of the drugs.  On July 9, 2001, both men met at the bakery; Rafa was joined by Nataya "Princesa" Posada, a fellow informant posing as the owner of the drugs, and Special Agent Anthony Toro-Zambrana ("Toro") of the Puerto Rican Department of Justice, pretending to be Princesa's bodyguard. Pinillos had brought two companions, one being Campusano.

Pinillos alone approached Rafa, and began negotiating the terms of the exchange.  Pinillos informed the group that "his friends" wanted to sample one kilo before going forward with the

purchase. Rafa refused, offering instead to sell the group an initial twenty-five kilo package. Negotiations then broke off but resumed later that day between Pinillos, Campusano, Rafa and Toro; eventually, the parties agreed on a complex scheme to make a transfer of cash for the package while protecting both sides.

Subsequently, Pinillos met Rafa and Toro at a parking lot, assuring them that he had seen the money needed to complete the transaction. Pinillos was going to test one to five kilos as a sample before completing the transaction. However, Toro grew nervous, and after Campusano arrived at the parking lot on foot, rather than in a car as the parties had agreed, he called nearby agents who arrested Pinillos and Campusano.

Pinillos, Campusano and Nolgie Rodriguez (the other man who had accompanied them to the bakery meeting) were convicted on two counts--conspiracy to possess with intent to distribute five or more kilograms of cocaine, 21 U.S.C. § 846 (2006), and aiding and abetting each other, in attempting to possess with intent to distribute five or more kilograms of cocaine, id. § 841(a)(1), 18 U.S.C. § 2(a) (2006).

At sentencing, the trial judge found--over defendants' objections--that each defendant was responsible for 100 kilograms of cocaine, triggering an initial offense level of 36. Pinillos and Campusano received two-level enhancements for obstruction of justice under U.S.S.G. § 3C1.1 for perjuring themselves. Both were

then sentenced to 235 months on each count, to be served concurrently.

While their appeals were pending, Booker altered the sentencing landscape by enlarging the trial judge's authority to vary from the guidelines and, while upholding the convictions, we remanded for resentencing. A revised PSR was filed and Pinillos sought a downward departure based on mental illness. The trial court denied the defendants' objections to the PSRs and the motion for downward departure, and the judge re-sentenced both defendants on the same terms as before.

In the new appeals from the sentence, both defendants argue that they never intended to buy one hundred kilos and that they lacked the financial capacity to do so. The trial court found that the conspiracy and attempt extended to one hundred kilos and that the defendants had not shown that they lacked the capacity to carry through.[1] Review of these factual findings is for clear error. United States v. Eke, 117 F.3d 19, 22 (1st Cir. 1997).

Based on Rafa's testimony as to the telephone call, the district judge could reasonably find that the initial bargain was for one hundred kilos; and, although the situation was perhaps

---

[1]Under settled law, the government bears the burden of showing quantity under the guidelines by a preponderance of the evidence, United States v. Nieves, 322 F.3d 51, 54 (1st Cir. 2003), and the defendants bear the burden of showing that that they lacked the financial capacity to purchase that quantity. See U.S.S.G. 2D1.1, n. 12.

ambiguous, it was surely not clear error to conclude that the later arrangements for smaller amounts were merely part of the intended delivery. Rafa was asked on cross-examination whether the negotiations were really about one, rather than one hundred kilos of cocaine. He responded:

> No, the negotiation[s] were about 100 kilos of cocaine. . . .You're talking about when we were talking about one kilo or five kilos or 25 kilos. It's a way to fractionalize the deal because nobody is going to bring down a hundred-kilo deal all at once. You have to do it first a kilo at a time or five or 25. And really, when they're talking about a kilo they're talking about . . . . [a] sample of the cocaine to see what the quality of the merchandise was like. . . .

Thus the court was not obliged to agree that Pinillos' initial agreement to purchase one hundred kilos was "mere puffery" nor that the later discussions limited the scope of the proposed transaction. It is commonplace that "where there is more than one plausible view of the circumstances, the sentencing court's choice among supportable alternatives cannot be clearly erroneous." United States v. Ruiz, 905 F.2d 499, 508 (1st Cir. 1990) (citations omitted).

As for Campusano, there is no direct proof that Pinillos and he discussed the one hundred kilo figure; but there is some indication that Campusano understood that a large transaction was contemplated and that 25 kilos was to be the initial delivery. The latter would likely be enough: "[a] defendant who conspires to

transport for distribution a large quantity of drugs, but happens not to know the precise amount, pretty much takes his chances that the amount actually involved will be quite large."  United States v. De La Cruz, 996 F.2d 1307, 1314 (1st Cir. 1993).

In all events, Campusano does not claim on appeal that he was unfamiliar with the one hundred kilo figure.  Instead, his argument, which Pinillos also makes, is that there is no evidence that they had the resources to finance a 100 kilo transaction.  We have reviewed the testimony and pre-sentence report with some care and are left uncertain how much Campusano was shown to have known; but we are not disposed to overturn a sentence on a ground raised neither at sentencing or on appeal.

The guidelines do allow the defense to show that whatever their commitment, they lacked the resources to purchase the agreed upon amount, U.S.S.G. § 2D1.1, n.12, and defendants say that the government never seized the funds that would be associated with such a large purchase.  Indeed, they say that they never had the resources to buy even a single kilo.  The question, however, is whether they proved that the transaction could not have been accomplished.

Here, Pinillos himself proposed the one hundred kilo figure and told Rafa and Toro that he had seen the money for the upcoming purchase.  Further, the defendants having the burden, United States v. Barnes, 244 F.3d 172, 177 (1st Cir. 2001), the

-7-

district court did not have to credit their denials of capacity to pay, and in any event Rodriguez was the supposed ultimate purchaser and there was certainly no attempt made by either defendant to offer any evidence with respect to his finances.

Both defendants contend lower quantities should have been adopted because the government was guilty of entrapment but, in this context, they are in fact alleging what we call "sentencing factor manipulation." This occurs "when 'a defendant, although predisposed to commit a minor or lesser offense, is entrapped in committing a greater offense subject to greater punishment.'" United States v. Villafane-Jimenez, 410 F.3d 74, 86-87 (1st Cir. 2005) (citations omitted).

Since Pinillos proposed the one hundred kilo figure, this is hardly a case in which the government pressed in the first instance for a figure greatly exceeding what was sought. See United States v. Brewster, 1 F.3d 51, 55 (1st Cir. 1993). The defendants say that the government offered the cocaine at the below-market price of $13,500 per kilo to entice a larger purchase but a low price is not itself decisive, United States v. Hulett, 22 F.3d 779, 782 (8th Cir. 1994), and the defendants offered no evidence of a supposed higher market price.

Although it appears that at the bakery the defendants did ask for a smaller delivery, the district judge was free to read the request in context as reflecting defendants' aroused suspicion as

to whether the sellers might be policemen and as an effort to segment the larger transaction to limit liability.  If the facts are so read, this is hardly a matter of enticing defendants to commit an offense to which they were not predisposed, let alone the "extraordinary misconduct" which the doctrine seeks to prevent.  United States v. Montoya, 62 F.3d 1, 3-4 (1st Cir. 1995) (internal quotation marks and citation omitted).

Defendants both challenge their two-level sentence enhancement for obstruction of justice based on their testimony at trial.  See U.S.S.G. § 3C1.1.  It is not clear that these arguments were preserved but in any case they are without merit.  Material and deliberately false testimony at trial is a standard basis for the enhancement, U.S.S.G. § 3C1.1 & n.4; United States v. Dunnigan, 507 U.S. 87, 92-94 (1993), so long as the district court finds the specific elements of perjury.  United States v. Gobbi, 471 F.3d 302, 314 (1st Cir. 2006).

Here, the district court made the necessary specific findings and they are amply supported.  Pinillos testified that he was not a drug dealer at all, and instead thought that he and Rafa were discussing the sale of computers.  As for Campusano, he testified that he was in Puerto Rico sightseeing and knew nothing about the drug transaction.  Given the guilty verdict, these were central and deliberate falsehoods.  Compare United States v. Akitoye, 923 F.2d 221, 228 (1st Cir. 1991).

The defendants' last joint objection is to the reasonableness of the sentence under Gall v. United States, 128 S. Ct. 586 (2007); Campusano also asserts that he was entitled to a two-level reduction for having a minor role in the offense. See U.S.S.G. § 3B1.2. Pinillos also argues in less than a paragraph that his mental illness vitiates the sentencing court's finding of willfulness as to the perjury that was the predicate for the obstruction of justice enhancement.

These claims are without merit (or, in the case of the mental illness claim, simply undeveloped, e.g., Esso Standard Oil Co. v. Monroig-Zayas, 445 F.3d 13, 18 n.1 (1st Cir. 2006)), and we mention them only to show that they have not been overlooked. The sentences are very substantial but they were lawfully imposed, they fall within the guideline range and there is no error.

Affirmed.