# United States Court of Appeals
## For the First Circuit

No. 08-2578

UNITED STATES OF AMERICA,

Appellee,

v.

JESUS GONZALEZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. William E. Smith, U.S. District Judge]

Before

Lynch, Chief Judge,
Boudin and Lipez, Circuit Judges.

Susan E. Taylor for appellant.
Donald C. Lockhart, Assistant United States Attorney, with
whom Peter F. Neronha, United States Attorney, and Sandra R.
Herbert, Assistant United States Attorney, were on brief, for
appellee.

June 23, 2010

**LYNCH, Chief Judge**.  This case demonstrates several patterns in urban drug dealing: the shipment of packages of large quantities of drugs through reputable carriers, here DHL; the use of largely empty apartments by drug conspirators as drug drops to which the shipments are addressed; and police who pretend to be carrier employees, make deliveries, and arrest those who take control of the package at the apartments.  The defendant, Jesus Gonzalez, convicted of conspiring to distribute and possessing with the intent to distribute cocaine and marijuana, tries to take advantage of this pattern to argue the court erred in not suppressing statements and evidence from this sequence, including from a search of the apartment to which his female co-conspirator consented.  Gonzalez is mistaken.

Gonzalez also made the mistake of committing perjury in the course of the suppression hearing.  He ended up with a two-level enhancement to his sentence, from which he appeals.  We affirm his conviction and sentence.

I.

A.      Facts

We describe the facts as the district court found them from the suppression hearing.  The court relied on the testimony of three police officers--Detectives Ruggiero and Sanzi and Sergeant Rave--and Gonzalez's consistent testimony.  We also note

-2-

inconsistent testimony by Sanzi and the defendant, Gonzalez, that the district court rejected.

In July 2007, DHL was given a package in California containing about one kilogram of cocaine and twenty-four pounds of marijuana to deliver to "Anna Ohoven," 80 Hawkins Street, Second Floor, Providence, Rhode Island. The record does not reveal how DHL learned that the box contained drugs, but Gonzalez does not deny that DHL had that information, made the police aware of the drugs, and turned the package over to Rhode Island police. A male caller had phoned DHL to inquire when it would be delivered; the DHL phone number was later found in Gonzalez's pocket.

Providence Detective Richard Ruggiero attempted to deliver the package on July 23, 2007, to the addressee, Ohoven, at the 80 Hawkins address, which was the second-floor apartment of a two-story, two-apartment building. He posed as a DHL deliveryman and drove a DHL truck. After knocking at the apartment door, Ruggiero heard someone climbing the stairs, who turned out to be Gonzalez. Gonzalez said he was expecting the package, opened the apartment door with his own keys, and invited Ruggiero inside the apartment. The apartment seemed vacant; it appeared to contain only a mattress and some clothes, not identifiable by gender from Ruggiero's position, strewn about.

Gonzalez offered to sign for the package, saying that Ohoven was his cousin and lived with him in the apartment. When

Ruggiero insisted that Anna Ohoven had to sign for it, Gonzalez said he could reach Anna and then called someone and spoke Spanish. He handed Ruggiero the phone and said Anna was on the line. Ruggiero spoke with a woman who identified herself as Anna and said she could pick the package up at noon. Ruggiero agreed to return at noon.

After Ruggiero left, Detective Timothy Sanzi, conducting surveillance, saw Gonzalez return to the apartment twice, the second time with a woman, later identified as Kristina LaFrance. LaFrance later pled guilty and testified against Gonzalez. Gonzalez and the woman went inside the building; then Gonzalez left the building, parked his car in front of a lemonade stand up the street, and watched the building from his car.

Ruggiero returned to the apartment about fifteen minutes after Gonzalez and the woman arrived at the building. LaFrance, who was inside the apartment, answered the door. She identified herself to Ruggiero as Anna and as the woman on the earlier phone conversation and said she lived in the apartment. She could not produce identification. LaFrance then signed for the package, writing the name "Anna Ohoben" and her address as the 80 Hawkins second-floor apartment. Ruggiero identified himself as a police officer, summoned backup, and arrested her.

LaFrance gave Ruggiero permission to search the apartment. Ruggiero then did a quick sweep of the apartment, which

the district court treated as a protective sweep; on the kitchen counter he found a pink slip of paper with the name "Anna Ohoben" signed repeatedly, as if for practice, and the DHL package tracking number. Further searching with other officers uncovered more evidence. LaFrance said that her brother's boyfriend had paid her $100 to pick up the package, and she produced a $100 bill as proof.

Sanzi and other police officers arrested Gonzalez, who was still sitting in his car. Detective Sanzi realized that Gonzalez spoke poor English; he brought Gonzalez to the apartment so that Sergeant Rave, who speaks fluent Spanish, could communicate with him. Rave read Gonzalez his <u>Miranda</u> rights in Spanish, which Gonzalez confirmed he understood, and then interviewed him. Gonzalez told Rave that he had never been to the apartment before and was simply buying lemonade up the street. Gonzalez's own testimony confirmed that his statement to Rave that he had never been to the apartment was untrue; at the suppression hearing Gonzalez testified that he lived in the apartment.

Rave also did a pat-down search of Gonzalez. Among other items, he found two pieces of paper. One had "DHL," "Anna Ohoben," and the package tracking number written on it. The other had the DHL phone number on it. He also found keys to a Mercedes-Benz; a silver Mercedes, registered to Gonzalez, was parked in the apartment building's driveway.

-5-

Ruggiero later obtained a search warrant for the Mercedes, after learning that Gonzalez sometimes used a silver Mercedes to traffic drugs. That search turned up further incriminating evidence.

At the suppression hearing, Detective Sanzi testified that he did not see Gonzalez enter the building when Ruggiero made his first delivery attempt. Sanzi was on roving surveillance and was driving around the block at the time. He did see Ruggiero enter the building and then heard on police radio that Ruggiero was speaking on the phone to a woman. Sanzi later saw Ruggiero come downstairs and approach and speak to Gonzalez, who was on the street.

Gonzalez testified that on July 23 he was living, alone, in the 80 Hawkins apartment. He came home and found a DHL delivery person waiting. Gonzalez testified that he was not expecting a delivery and that he had told Ruggiero that the package was not his. He could not explain why the package was addressed to his apartment.

Gonzalez testified that he told Ruggiero that his cousin possibly was expecting a package. At the hearing Gonzalez could not name that cousin, but he was sure he had not said her name was Anna Ohoven. He admitted putting his cousin on the phone with Ruggiero but said that he did not know what was said. Gonzalez testified that he offered to let Ruggiero leave the package outside

the apartment, which Ruggiero declined, and Gonzalez and Ruggiero left. Gonzalez denied ever allowing Ruggiero inside the apartment.

Gonzalez testified that he then drove to see his brother and invited his brother's girlfriend, LaFrance, to clean the apartment. He testified that he dropped LaFrance off to clean the apartment and purchased a lemonade while waiting for LaFrance to finish. Gonzalez testified that Rave did not read his Miranda rights before interrogating him at the apartment, which the district court did not believe. He claimed that he was driven to the state police barracks (in his own car) and there signed a waiver form, though his rights were never read to him. Gonzalez also said that Rave searched him at the barracks, not at the apartment.

The district court fully credited Ruggiero's and Rave's testimony, reflected in the earlier narrative. It credited Sanzi's and Gonzalez's testimony to the extent their stories matched the other officers'. It did not credit any of Gonzalez's conflicting testimony.

B.      Procedural History

Gonzalez was indicted with LaFrance on July 25, 2007, on three counts of conspiracy to distribute and possession with the intent to distribute cocaine and marijuana. On August 19, 2008, Gonzalez moved to suppress evidence from the searches of his apartment, his person, and his Mercedes, as well as the statements

he made to Rave.  The district court orally denied the motion after a hearing on September 3, 2008, at which the court heard testimony. The court ruled that police had probable cause to arrest Gonzalez and that Ruggiero reasonably concluded that LaFrance had apparent authority to consent to the search of the apartment, which foreclosed Gonzalez's challenge to the warrant to search his car. The court also found Gonzalez had been read his Miranda rights.

A jury convicted Gonzalez on September 11, 2008, after a four-day trial.  On December 12, 2008, the district court held a sentencing hearing for Gonzalez.  The court imposed a two-level enhancement for obstruction of justice after finding Gonzalez had committed perjury during the suppression hearing.  This ruling increased Gonzalez's base offense level from 26 to 28.  The district court sentenced him to the bottom of his guidelines range, seventy-eight months, and supervised release and imposed a $300 special assessment.

## II.

Gonzalez's challenges to the district court's suppression rulings are meritless.  "In reviewing motions to suppress, we review legal determinations de novo, but factual findings for clear error, and will uphold a lower court's denial of a motion to suppress so long as 'any reasonable view of the evidence supports it.'"  United States v. Bater, 594 F.3d 51, 55 (1st Cir. 2010)

(citations omitted) (quoting <u>United States</u> v. <u>Mendez-de Jesus</u>, 85 F.3d 1, 2 (1st Cir. 1996)).

A.        <u>Search of the Apartment</u>

Gonzalez does not challenge the district court's factual finding that LaFrance voluntarily consented to the search; he argues she lacked apparent authority to do so, and so the evidence from the apartment should have been suppressed.  The government chose to present the consent as having been given with apparent authority, and so we do not consider whether LaFrance had actual authority.

A search is valid if, at the time, officers reasonably believe a person who has consented to a search has apparent authority to consent, even if the person in fact lacked that authority.  <u>Illinois</u> v. <u>Rodriguez</u>, 497 U.S. 177, 185-86, 188-89 (1990); <u>United States</u> v. <u>Carrasco</u>, 540 F.3d 43, 49 (1st Cir. 2008).[1]  The touchstone of this inquiry is what was reasonable

---

[1]    Consent is an exception to the Fourth Amendment's prohibition on government searches of a person's residence without a warrant.  <u>Rodriguez</u>, 497 U.S. at 181.  Police may obtain consent from the occupant "or from a third party who possesses common authority over the premises."  <u>Id.</u>  Common authority means people are mutually using the property such that they have "joint access or control" over it "for most purposes."  <u>Id.</u> (quoting <u>United States</u> v. <u>Matlock</u>, 415 U.S. 164, 171 n.7 (1974)).
Mutual use means people make such shared use of a residence "that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection" of the common residence "and that the others have assumed the risk that one of their number might permit the common area to be searched."  <u>Matlock</u>, 415 U.S. at 171 n.7.

-9-

under the circumstances. See Rodriquez, 497 U.S. at 188-89. Viewed objectively, "would the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party has authority over the premises?" Id. at 188 (quoting Terry v. Ohio, 392 U.S. 1, 21-22 (1968)) (alteration in original) (internal quotation marks omitted).

Detective Ruggiero could have reasonably believed LaFrance had authority to consent to the search of the apartment. LaFrance and Gonzalez told Ruggiero that she lived in the apartment, and she answered the door when Ruggiero returned. The package was addressed to Anna Ohoven at the second-floor apartment on 80 Hawkins. "Ohoven" arranged with Ruggiero to pick up the package there at noon. LaFrance identified herself as Ohoven, and she signed for the package.

Gonzalez argues it was unreasonable for the officers to believe LaFrance's claim that she lived in the apartment because she misspelled the name Ohoven as "Ohoben," could not produce identification, and it appeared no one lived in the apartment. If these facts signaled that LaFrance was lying, they supported the inference that the apartment was not lived in at all but was being used as a drug drop to which she at least had joint access.

The test is not whether LaFrance actually lived in the apartment but whether she apparently had sufficient authority to consent to its search. It would turn the Fourth Amendment upside

down to say that an officer was unreasonable because the person claiming authority who answered the door did not in fact live there but used it for drug dealing. The doctrine of apparent authority to consent to searches of physical spaces is not limited to residences where people live. While many cases have arisen in the context of dwellings, e.g., United States v. Penney, 576 F.3d 297, 307 (6th Cir. 2009); United States v. Nichols, 574 F.3d 633, 636-37 (8th Cir. 2009); United States v. McGee, 564 F.3d 136, 139-41 (2d Cir. 2009), neither the Fourth Amendment nor the ability to consent is so limited, see, e.g., United States v. Murphy, 516 F.3d 1117, 1124 (9th Cir. 2008) (observing that common authority extends "well beyond residences" and holding that a person had common authority over storage units); United States v. Law, 528 F.3d 888, 903-04 (D.C. Cir. 2008) (holding that a landlord had authority to consent to a search of an apartment the defendant did not live in but used for drug storage).

B.      Search Incident to Arrest

Gonzalez argues the evidence from the search incident to his arrest should have been suppressed because police lacked probable cause to arrest him. Probable cause exists when reasonably prudent police officers, under the facts and circumstances, would believe the defendant had committed or was about to commit a crime. United States v. Burhoe, 409 F.3d 5, 10

(1st Cir. 2005).  The recitation of the facts earlier refutes Gonzalez's argument.

When Ruggiero initially tried to deliver the package, Gonzalez said he was expecting the delivery, claimed to be Ohoven's cousin, and offered to sign for the package.  Gonzalez had the keys to the apartment at the delivery address and let Ruggiero inside that apartment.  Gonzalez also put Ruggiero on the phone with "Ohoven" and later drove LaFrance, who ultimately signed for the package as "Ohoben," to the 80 Hawkins apartment while Gonzalez watched nearby.  There was probable cause.

C.        The Warrant to Search Gonzalez's Mercedes-Benz

Gonzalez argues that without evidence recovered from his apartment and person there was insufficient evidence to support the search warrant of his Mercedes-Benz.  It follows from what we have said that this argument fails.[2]

D.        Statements Gonzalez Made after His Arrest

Gonzalez next argues the district court should have suppressed the statements he made to Rave after his arrest because, contrary to Rave's testimony, Rave did not first read his Miranda rights to him.  The district court did not clearly err by crediting Rave's testimony over Gonzalez's.

---

[2]     We need not reach the district court's alternative conclusion that, even without the evidence found on Gonzalez or in the apartment, sufficient evidence supported the search warrant.

-12-

Gonzalez appears to make one further argument: that a language barrier prevented him from understanding his rights. Rave's testimony, accepted by the district court, that he read Gonzalez those rights in Spanish and that Gonzalez confirmed he understood them refutes this claim.

## III.

The district court did not err when it imposed a two-level sentencing enhancement for obstruction of justice after finding Gonzalez committed perjury at the suppression hearing. We review the court's legal conclusions de novo and factual conclusions for clear error. United States v. Duclos, 214 F.3d 27, 31 (1st Cir. 2000). Gonzalez does not claim that the district court's interpretation of the Sentencing Guidelines was error; he argues there was insufficient evidence to support the enhancement.

District courts may impose a sentencing enhancement for obstruction of justice, see U.S.S.G. § 3C1.1, when, inter alia, they find by a preponderance of the evidence that a defendant has committed perjury, United States v. Shinderman, 515 F.3d 5, 18-19 (1st Cir. 2008); United States v. Gobbi, 471 F.3d 302, 314 (1st Cir. 2006); e.g., United States v. Meada, 408 F.3d 14, 19-20 (1st Cir. 2005) (upholding an enhancement based on false testimony at a suppression hearing).

To impose this enhancement, district courts must find the "specific elements of perjury." United States v. Campusano, 556

F.3d 36, 40 (1st Cir. 2009). Perjury means "false testimony under oath concerning a matter material to the proceeding, as long as the testimony is given 'with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.'" Shinderman, 515 F.3d at 19 (quoting United States v. Dunnigan, 507 U.S. 87, 94 (1993)). Courts "should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice." U.S.S.G. § 3C1.1 cmt. n.2.

Gonzalez's claim is that the district court did not sufficiently consider whether he simply suffered memory lapses or was confused. We agree with the district court that "there is no way you can view [the] entire testimony as anything other than an effort to completely and totally deceive the Court in an effort to try to get the Court to grant the suppression motion."

Gonzalez's testimony involved a series of convenient and implausible denials. We list only a few. He insisted that he was not expecting a delivery and that he never told Ruggiero the delivery was his or that he knew Anna Ohoven. And he insisted, despite Rave's contrary testimony, that Rave never read his Miranda rights to him.

Gonzalez failed to justify several inconsistencies. Gonzalez never explained why papers with the name "Anna Ohoben,"

-14-

the package's tracking number, and DHL's phone number were in his pocket, other than to suggest the police planted them there. Gonzalez also did not explain why he would need LaFrance to clean a basically empty apartment. As the district court observed, his denials were conveniently targeted at critical evidence that supported his suppression motion.

Affirmed.