# United States Court of Appeals
## For the First Circuit

No. 18-1793

UNITED STATES OF AMERICA,

Appellee,

v.

DUSTIN MOSS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph N. Laplante, U.S. District Judge]

Before

Torruella, Lynch, and Kayatta,
Circuit Judges.

Simon R. Brown, with whom Preti Flaherty PLLP was on brief, for appellant.
John S. Davis, Assistant United States Attorney, with whom Scott W. Murray, United States Attorney, was on brief, for appellee.

August 26, 2019

**TORRUELLA**, **Circuit Judge**. Dustin Moss ("Moss") appeals from the district court's denial of his motion to suppress approximately twenty pounds of methamphetamine that a postal inspector discovered in two United States Postal Service Priority Mail Express packages, as well as any evidence resulting from the searches of those packages. After careful review, we affirm.

## I. BACKGROUND

### A. Factual Background

#### 1. The 730 Package

On April 18, 2017, U.S. Postal Inspector Bruce Sweet ("Sweet") singled out from a list of incoming mail a package scheduled to arrive from Las Vegas, Nevada, to Manchester, New Hampshire. Since October 2016, Sweet had been participating in the investigation of a drug conspiracy in which packages containing methamphetamine were sent from Las Vegas to New Hampshire and, in return, packages containing money were sent from New Hampshire to Las Vegas. According to postal databases, the singled-out package weighed twenty-six pounds; was addressed to Brian O'Rourke at 3 Blackberry Way, Apt. 108, Manchester, New Hampshire; and bore the tracking number EL810533730US (the "730 Package"). More importantly, it had "328 Florrie Ave."[1] in Las Vegas as the return

---

[1] Sweet later determined that the "328 Florrie Ave." address in Las Vegas did not exist.

-2-

address, which matched the "Florrie Ave." return address used in other packages identified throughout the drug conspiracy investigation. Based on these characteristics and his knowledge of the investigation, Sweet deemed the 730 Package suspicious.

Accordingly, the night before the package's arrival, Sweet drafted an affidavit in support of a warrant to search the 730 Package and e-mailed it to Assistant United States Attorney William Morse ("AUSA Morse"). Sweet's affidavit included an attachment labelled "Attachment A," which accurately described the 730 Package as a "black 'Kicker Speaker' cardboard box," and detailed the package's weight and dimensions. The attachment also identified the 730 Package's addressee, O'Rourke, as well as the package's final destination.

Sweet collected the 730 Package and placed it in a canine drug-sniff lineup shortly after the package arrived in Manchester on the morning of August 19, 2017. After the drug-sniffing dog alerted on the 730 Package, Sweet secured the package in the United States Postal Inspection Service's parcel inspection room.[2] Sweet effectively separated the 730 Package from all other mail held in the postal facility given that there were no other packages in the parcel inspection room at this point.

---

[2] Access to the parcel inspection room is limited to Postal Inspection Service employees.

-3-

AUSA Morse proceeded to e-mail Sweet's affidavit to court personnel that same morning. AUSA Morse's e-mail indicated that his office was still working on the associated paperwork. Within an hour of the e-mail's delivery, AUSA Morse and Sweet arrived at the magistrate judge's chambers with a complete search warrant packet consisting of: (1) the search warrant application; (2) Sweet's affidavit and its two accompanying attachments; and (3) the proposed search warrant. In the space provided for a description of the property to be searched, the warrant application stated: "See Attachment A to Affidavit of U.S. Postal Inspector Bruce A. Sweet which is incorporated herein by reference.". As mentioned above, Attachment A of Sweet's affidavit provided an accurate and detailed description of the 730 Package. After reviewing the search warrant application and Sweet's affidavit, the magistrate judge issued the search warrant.[3]

However, due to a clerical error in the U.S. Attorney's Office, the document identified as "Attachment A" that was appended to the search warrant was different from the one attached to Sweet's affidavit and reviewed by the magistrate judge. The issued warrant's Attachment A did not describe the 730 Package, a twenty-

---

[3] Similar to the search warrant application, the actual search warrant stated "See Attachment A, as attached hereto and incorporated herein" in the space provided for the description of the property to be searched.

six-pound cardboard box, but rather a five-ounce envelope Sweet had searched during the course of an unrelated investigation from November 2016. [4]  The warrant, nevertheless, still included information reflecting its relation to the 730 Package. Specifically, its caption correctly read:

> In the Matter of the Search of
>
> (*Briefly describe the property to be searched . . .*)
>
> USPS Priority Mail Express Package Bearing Tracking
>
> Number EL810533730US.

In other words, the issued warrant included the 730 Package's exclusive tracking number, despite the description of another package in its Attachment A.

Unaware of the mistakenly appended attachment, Sweet proceeded to search the 730 Package.  Inside the package, he found a large speaker and, inside the speaker, twelve zip-top bags, each containing almost exactly one pound of a white crystalline substance later identified as methamphetamine.  Sweet then replaced the narcotics with miscellaneous items to bring the box to its original weight, repackaged the speaker, resealed the

---

[4]  Apart from being of a different type and weight than the 730 Package, the package described in the issued warrant's Attachment A was addressed to a different recipient, Mr. Golden; destined to a different city, Laconia, New Hampshire; had a different sender, Sequoia High School in California; and, of course, was identified with a different tracking number, EL576175385US.

package, and delivered it to the post office for the next stage of the government's operation -- apprehension of the 730 Package's addressee, Brian O'Rourke.

O'Rourke was a crack cocaine addict. His supplier was Sabrina Moss ("Sabrina"), defendant-appellant Moss's sister. O'Rourke, Sabrina, and Moss had all been in the same hotel room with other drug users about a week prior to the arrival of the 730 Package. O'Rourke and Moss did not know each other and did not speak to each other in that hotel room. Their interaction was limited to what can be described as a mutual acknowledgement of each other's presence: They waved at each other after Sabrina pointed out Moss to O'Rourke. Sabrina then asked O'Rourke if he was willing to receive a package at his apartment on Moss's behalf in exchange for three-and-a-half grams of crack cocaine.[5] O'Rourke agreed.

But the terms of this agreement were never fleshed out any further. O'Rourke left the hotel room without Sabrina telling him when to expect the package to arrive or the number of packages he would receive. Nonetheless, from their conversation's reference to "a package," O'Rourke understood that their arrangement was limited to the receipt of a single piece of mail.

---

[5] According to O'Rourke, this amount of crack cocaine had a street value of around $300.

O'Rourke believed everything would transpire in a simple, quick manner: The package would arrive at his apartment, Moss would pick it up, and he would receive his illicit compensation. To O'Rourke's dismay, not even his first assumption materialized.

The same day the 730 Package arrived in Manchester, a postal inspector dressed as a letter carrier delivered a notice to O'Rourke's mailbox informing him that the package was ready for pickup at the post office. Moss met with O'Rourke at the latter's apartment, where, instead of going directly to the post office, they waited, believing that the 730 Package might yet be delivered there. Several hours later, Sabrina and her boyfriend arrived at O'Rourke's apartment and joined the waiting game. Once they realized the 730 Package would not be delivered directly to O'Rourke's apartment, the four individuals decided to decamp. O'Rourke and Moss left the apartment at the same time. O'Rourke drove directly to the post office, while Moss drove to a shopping center located approximately a quarter mile away from the post office and parked behind a furniture store.

Sweet, who was behind the counter at the post office, handed the 730 Package to O'Rourke. O'Rourke then met with Moss behind the furniture store and placed the 730 Package in the back seat of Moss's vehicle. Shortly thereafter, law enforcement

intervened and arrested Moss and O'Rourke on the spot. O'Rourke was subsequently released on bond, while Moss remained in custody.

## 2. The 962 Package

Three days later, on April 22, 2017, a second package from Las Vegas, bearing the EL652259962US tracking number (the "962 Package"), was delivered to O'Rourke's address. Because it was a box too large to fit in his mailbox, the 962 Package was placed in the building's parcel lockbox. O'Rourke noticed a key in his mailbox, which served to notify residents that they had a larger package ready for pickup. Because he was not expecting a package and wanted "nothing to do with it," he opted to ignore the key and wait until he had spoken with his lawyer before taking any action. The following day, however, O'Rourke's friend, Brenda Krimtler ("Krimtler") -- who was helping O'Rourke get his affairs in order before he entered a drug rehabilitation program -- picked up his mail and used the key to retrieve the 962 Package from the building's parcel lockbox.

Krimtler then brought the 962 Package to O'Rourke's kitchen, opened it, and noticed it was full of white powder. She reacted to this surprise by telling O'Rourke, who was in another room, about the package's contents. O'Rourke responded by instructing Krimtler to reseal the package and return it to the

parcel lockbox, which she did without O'Rourke ever setting his eyes on it.

O'Rourke then called his attorney and told her about the package. With O'Rourke's agreement, the attorney called Sweet and explained the situation. She informed Sweet about the 962 Package, told him that the 962 Package had been opened, that O'Rourke believed it contained narcotics, that O'Rourke did not want it, and that Sweet could search it.

With permission from O'Rourke's attorney, Sweet called O'Rourke later that evening. O'Rourke confirmed the information that had been previously conveyed by his attorney. He told Sweet that his friend had opened the package, that it appeared to contain narcotics, and that he consented to the package being seized and searched. Because O'Rourke expressly granted him permission to search the package, Sweet did not seek a warrant. Instead, he contacted another postal inspector who lived closer to O'Rourke, Steve Riggins, who proceeded to retrieve the 962 Package from the parcel lockbox.[6]

Riggins took the 962 Package to his car and, with Sweet on the phone, opened it. Inside the package he found a freezer

---

[6] Given that the parcel lockboxes are designed to lock in the key and remain open once a resident gains access, the lockbox with the 962 Package was open when Riggins arrived to retrieve the package.

bag.  After unfurling the top of the freezer bag,[7] he noticed that it contained zip-top bags with white powder.  Riggins then took the 962 Package to the Manchester postal facility, where he and Sweet thoroughly searched it and found that it contained a total of eight zip-top bags with approximately one pound of methamphetamine each.

## B.  Procedural History

On May 17, 2017, a grand jury indicted Moss for conspiracy to distribute a controlled substance (50 grams or more of methamphetamine), in violation of 21 U.S.C. § 846 (Count 1), and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (Count 2).  Moss moved to suppress the 730 Package and the 962 Package, as well as any fruits obtained from their searches.  The government opposed Moss's motion to suppress, contending, among other things, that Moss lacked a reasonable expectation of privacy in the packages.[8]

---

[7]  The top of the freezer bag was not sealed but rather furled to one side, which allowed the bag to fit within the 962 Package.

[8]  While courts typically treat the question of whether a defendant has a reasonable expectation of privacy as a threshold issue, sometimes "refer[ing] to it as an issue of 'standing,'" United States v. Lipscomb, 539 F.3d 32, 36 (1st Cir. 2008) (citation omitted), this analysis is "more properly placed within the purview of substantive Fourth Amendment law than within that of standing," Minnesota v. Carter, 525 U.S. 83, 88 (1998) (quoting Rakas v. Illinois, 439 U.S. 128, 140 (1978)).  As the Supreme Court recently explained, whether a defendant has a reasonable expectation of privacy "is not a jurisdictional question and hence need not be

On April 13, 2018, the district court held an evidentiary hearing on the motion to suppress. After listening to the testimony of Sweet, O'Rourke, Riggins, and Moss, the district court denied Moss's motion to suppress from the bench. In doing so, however, the court opted to assume Moss had a reasonable expectation of privacy in the packages and denied his motion to suppress because neither search was unconstitutional.

On April 25, 2018, Moss pleaded guilty to both counts. Under the plea agreement, however, Moss explicitly reserved the right to appeal the district court's denial of his motion to suppress. On August 2, 2018, the district court issued a written decision explaining the basis for its ruling on the motion to suppress, and sentenced Moss to a total of 300 months' imprisonment: 240 months for Count 1 and 60 months for Count 2, to be served consecutively.

In its written decision, as it had done in its ruling from the bench, the district court again assumed arguendo that Moss held a reasonable expectation of privacy in the searched packages and concluded that neither search was unconstitutional.

---

addressed before addressing other aspects of the merits of a Fourth Amendment claim." <u>Byrd</u> v. <u>United States</u>, 138 S. Ct. 1518, 1530 (2018). Accordingly, we do not use the term "standing" to describe the question. <u>See</u> <u>United States</u> v. <u>Bouffard</u>, 917 F.2d 673, 675 (1st Cir. 1990).

-11-

The district court found that the warrant authorizing the search of the 730 Package was not facially invalid despite the government's attachment of the incorrect Attachment A. The court reasoned that, although the attachment "described the wrong package, the face of the warrant listed the correct tracking number and, under the circumstances, the probability that Inspector Sweet -- who had already secured the 730 package -- would execute the warrant by searching an incorrect package was exceedingly low."

As to the 962 Package, the court held that Riggins's warrantless search was justified by both the private search doctrine and O'Rourke's consent. Specifically, it found that the private search doctrine applied because Riggins's search did not exceed the scope of Krimtler's private search, and that O'Rourke had both apparent and actual authority to provide consent given that he was both the addressee and recipient of the package. The current appeal ensued.

## II.  ANALYSIS

We review the district court's denial of a motion to suppress scrutinizing its factual findings for clear error and its legal conclusions, including its ultimate constitutional determinations, de novo. See United States v. Owens, 917 F.3d 26, 34 (1st Cir. 2019). We "may affirm . . . suppression rulings on any basis apparent in the record." United States v. Ackies, 918

F.3d 190, 197 (1st Cir. 2019) (quoting United States v. Arnott, 758 F.3d 40, 43 (1st Cir. 2014)).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A search within the meaning of the Fourth Amendment occurs whenever the government intrudes upon any place and in relation to any item in which a person has a reasonable expectation of privacy. See United States v. Bain, 874 F.3d 1, 12 (1st Cir. 2017) (quoting Katz v. United States, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)); United States v. Stokes, 829 F.3d 47, 51 (1st Cir. 2016). To advance claims for protection under the Fourth Amendment, the defendant carries the burden of "showing that he has 'a reasonable expectation of privacy in the area searched and in relation to the items seized.'" Stokes, 829 F.3d at 51 (quoting United States v. Aguirre, 839 F.2d 854, 856 (1st Cir. 1988)).

Because whether a defendant has a reasonable expectation of privacy is not jurisdictional, it is within an appellate court's discretion to forgo the question and proceed directly to the constitutionality of the challenged searches. See Byrd v. United States, 138 S. Ct. 1518, 1530-31 (2018). We opt to exercise this discretion here and, without deciding whether Moss had a reasonable

-13-

expectation of privacy, address the constitutionality of the searches of the 730 and 962 Packages in turn.

## A. Sweet's Search of the 730 Package

Moss contends that the district court erred in denying his motion to suppress the 730 Package and the fruits of its search. Because the warrant incorporated by reference an attachment that described a totally distinct package, Moss argues that it failed to particularly describe the 730 Package and was thus facially invalid for failure to comport with the Fourth Amendment's particularity requirement. While we do not condone the government oversight in assembling the 730 Package's search warrant, this argument fails.

The Fourth Amendment unambiguously requires that warrants "particularly describ[e] the place to be searched, and the persons or things to be seized." Groh v. Ramírez, 540 U.S. 551, 557 (2004) (quoting U.S. Const. amend. IV) (emphasis omitted). The manifest purpose of this constitutional rule, known as the particularity requirement, "is to prevent wide-ranging general searches by the police." United States v. Bonner, 808 F.2d 864, 866 (1st Cir. 1986). "The test for determining the adequacy of the description [in a warrant] of the location to be searched is whether the description is sufficient to enable the executing officer to locate and identify the premises with reasonable effort,

-14-

and whether there is any reasonable probability that another premise might be mistakenly searched." Id. (internal quotation marks omitted). When carrying out our inquiry, we do not strictly limit our analysis to the four corners of the warrant but also "consider[] the circumstances of [the warrant's] issuance and execution." Id. Notwithstanding, the content of the warrant application is outside the scope of our analysis -- it cannot save the actual warrant from its failure to provide an adequate description. See Groh, 540 U.S. at 557. "The fact that [a warrant] application adequately describe[s] the 'things to be seized' does not save [a] warrant from its facial invalidity. The Fourth Amendment by its terms requires particularity in the warrant, not in the supporting documents." Id. (emphasis omitted).[9]

Supreme Court precedent provides useful guidance. In Groh, the Supreme Court held that a warrant that "did not describe the items to be seized at all" was facially invalid under the

_____

[9] Notwithstanding, "[a]n affidavit may be referred to for purposes of providing particularity if the affidavit accompanies the warrant, and the warrant uses suitable words of reference which incorporate the affidavit." United States v. Roche, 614 F.2d 6, 8 (1st Cir. 1980) (citation omitted); accord Groh v. Ramírez, 540 U.S. 551, 557-58 (2004) ("We do not say that the Fourth Amendment prohibits a warrant from cross-referencing other documents. Indeed, most Courts of Appeals have held that a court may construe a warrant with reference to a supporting application or affidavit if the warrant uses appropriate words of incorporation, and if the supporting document accompanies the warrant.").

Fourth Amendment because it did not meet the particularity requirement. Id. at 558. While the warrant application stated that law enforcement sought to seize "automatic firearms . . . grenades, grenade launchers, [and] rocket launchers," among other things, the warrant itself simply referenced the place to be searched -- a "single dwelling residence . . . blue in color" -- in the space provided for the description of the items to be seized. Id. at 554, 558. In reaching its conclusion that the warrant did not meet the particularity requirement, the Supreme Court stressed that the "obviously deficient" warrant "did not simply omit a few items from a list of many to be seized, or misdescribe a few of several items. Nor did it make what fairly could be characterized as a mere technical mistake or typographical error." Id. at 558.

Our decision in Bonner is similarly helpful here. There, the defendants challenged a warrant authorizing the search of their residence, claiming that it was defective because it omitted the residence's exact address. 808 F.2d at 865-66. In upholding the validity of the search warrant, we concluded that, despite the "technical omission" of the address, the "[defendants'] residence was described with sufficient particularity," given that a detailed physical description of the residence was included in the warrant. Id. at 866-67. We also found that "[t]here was no risk

-16-

that federal agents would be confused and stumble into the wrong house, or would take advantage of their unforeseeable windfall and search houses indiscriminately." Id. at 866-67. In support of this conclusion, we emphasized that "[t]he agents, having previously conducted the surveillance [of the residence], knew exactly which house they wanted to search . . . and searched only that house." Id. at 867.

We faced a similar situation in United States v. Vega-Figueroa, 234 F.3d 744 (1st Cir. 2000), and again denied the defendant's challenge to the district court's denial of his motion to suppress. In that case, the defendant claimed that a warrant to search his residence failed to comply with the particularity requirement because it "mistakenly described the apartment to be searched as building 44, apartment 446," when "[his] address was in fact building 45, apartment 446." 234 F.3d at 756. Noting that the defendant's apartment was the only residence eventually searched and that the same officer who "made the observations that were the basis for issuing the warrant" was also the warrant's executing officer, as well as a member of the search team, we concluded that there was no risk of the wrong house being searched. Id. Therefore, we ruled that the warrant was properly issued and executed. Id.

Here, the district court did not err in denying Moss's motion to suppress. The present case is distinguishable from Groh and more analogous to Bonner and Vega-Figueroa. In Groh, the issued warrant did not describe the items to be seized at all. 540 U.S. at 558. In turn, the warrant at issue in this appeal provides a description of the 730 Package in the form of its exclusive tracking number, which was included in the issued warrant's caption. In other words, the warrant was not totally devoid of an accurate description of the 730 Package. And Moss concedes as much.

Our inquiry, however, does not end here. Because the 730 Package's warrant includes two conflicting descriptions -- on one hand, the correct tracking number in its caption and, on the other, the inaccurate description in the appended attachment -- we must look further to ensure it meets the particularity requirement. Thus, we employ the rubric set out in Bonner to ascertain the adequacy of the warrant's description.

Under the test established in Bonner, we first examine the adequacy of a warrant's description based on whether it is "sufficient to enable the executing officer to locate and identify" the object to be searched with reasonable effort. 808 F.2d at 866 (emphasis added). Because Sweet had segregated the 730 Package in the parcel inspection room prior to the issuance of the search

-18-

warrant, there was no real risk here of him having to expend an unreasonable effort to locate and identify it. Moreover, Sweet's familiarity with the 730 Package, which will be discussed in detail below, meant that, in any case, he did not require a description beyond the exclusive tracking number to properly execute the warrant. See id. at 867 (holding that a detailed description of a residence, albeit one without a specific address, was sufficient to meet the particularity requirement given that the agents executing the warrant because had previously surveilled it). While definitely not as detailed as the description that Sweet and Moss intended to incorporate by reference into the warrant, the tracking number's unique combination of thirteen digits provided a description with a high degree of particularity. Again, Moss concedes as much. Thus, we conclude that, within the circumstances of this case, the inclusion of the 730 Package's tracking number in the warrant would have been sufficient for the executing officer, Sweet, to locate and identify it without expending an unreasonable effort even if he had not isolated it in the parcel inspection room prior to the issuance of the warrant.

Considering the circumstances of its issuance and execution, the warrant authorizing the 730 Package's search suffered from a mere technical error. See id. at 866; see also United States v. Qazah, 810 F.3d 879, 886 (4th Cir. 2015)

-19-

(classifying the inclusion of an incorrect attachment in a search warrant as a "technical one").  The fact that Sweet isolated the 730 Package in the parcel inspection room following the positive dog sniff but prior to the issuance of the search warrant coupled with his familiarity with the package's physical characteristics (e.g., size, weight, etc.) effaced any reasonable probability of him mistakenly searching another package.  Apart from being the warrant's executing officer, Sweet participated in every stage leading up to the search of the 730 Package.  He conducted the investigation that led to the 730 Package being singled out even before its arrival in Manchester; was present during the canine's drug sniff; drafted the search warrant application's affidavit; sought issuance of the warrant from the magistrate judge; and, of course, executed the search.  Cf. Bonner, 808 F.2d at 866-67; Vega-Figueroa, 234 F.3d at 756.  Furthermore, Sweet knew that the package described in the issued search warrant's Attachment A was related to a separate 2016 investigation in which he had participated.[10]

In sum, we find that, despite the presence of conflicting descriptions in the warrant, the 730 Package was described with

_____

[10]  Furthermore, the property described in the issued warrant's Attachment A and the 730 Package had significantly different physical characteristics; while the first was a five-ounce envelope, the second was a twenty-six-pound box.

sufficient particularity for Sweet to identify it and there was no reasonable probability of Sweet searching another package; therefore, the warrant was valid.

**B. Warrantless Search of 962 Package**

The warrantless search of the 962 Package was justified by O'Rourke's consent. O'Rourke verbally consented to the search of the 962 Package twice -- first through his attorney and then directly to Sweet. As the package's addressee and recipient, O'Rourke had actual authority over the 962 Package and therefore capacity to consent to its search. See United States v. Matlock, 415 U.S. 164, 171 n.7 (1974) (recognizing control as a factor to be considered when determining whether a person has authority over property); see also Eagle Tr. Fund v. United States Postal Serv., 365 F. Supp. 3d 57, 60-61 (D.D.C. 2019) ("[T]he Domestic Mail Manual, which sets out the procedures for mail delivery by the Postal Service, provides that an addressee controls the delivery of its mail."), appeal on other grounds docketed, No. 19-5090 (D.C. Cir. Apr. 8, 2019); 39 C.F.R. § 211.2(a)(2) (stating that the Domestic Mail Manual forms part of the Postal Service's regulations). Notwithstanding, even if he lacked authority, as Moss contends, the search was valid because, being the package's addressee, it was reasonable for Sweet and Riggins to believe that O'Rourke had apparent authority to consent to its search. See

United States v. González, 609 F.3d 13, 18 (1st Cir. 2010) ("A search is valid if, at the time, officers reasonably believe a person who has consented to a search has apparent authority to consent, even if the person in fact lacked that authority.").

We therefore hold that the warrantless search of the 962 Package did not infringe Moss's Fourth Amendment rights.[11]

### III.  CONCLUSION

Based on the foregoing, we affirm the district court's denial of Moss's motion for suppression of evidence.

**Affirmed**.

---

[11]  Because O'Rourke's consent justified the warrantless search of the 962 Package, we need not address the district court's alternate, private search doctrine basis for the denial of the package's suppression. See United States v. Ackies, 918 F.3d 190, 197 (1st Cir. 2019).