UNITED STATES, Plaintiff, Appellant,

v.

Maria E. DE LOS SANTOS FERRER,
Defendant, Appellee.

No. 92–2171.

United States Court of Appeals,
First Circuit.

Heard Feb. 2, 1993.

Decided July 15, 1993.

Vicki Marani, Attorney, U.S. Dept. of Justice, Washington, DC, with whom Daniel F. Lopez–Romo, U.S. Atty., and Antonio R. Bazan, Asst. U.S. Atty., Hato Rey, PR, were on brief for plaintiff, appellant.

Frank D. Inserni, Hato Rey, PR, by appointment of the Court, for defendant, appellee.

Before SELYA, Circuit Judge, COFFIN, Senior Circuit Judge, and BOUDIN, Circuit Judge.

BOUDIN, Circuit Judge.

Based on evidence obtained through a warrantless search of airport luggage, Maria De Los Santos Ferrer was indicted for possession with intent to distribute twenty kilograms of cocaine, 21 U.S.C. § 841(a)(1), and its possession on board an aircraft departing from the United States, 21 U.S.C. § 955. De Los Santos Ferrer filed a motion to suppress the evidence which the district court granted. The government appeals the suppression order. We reverse.

On March 26, 1991, Customs agents at the Luis Munoz Marin International Airport in Puerto Rico were conducting a training exercise with a certified drug-sniffing canine when the dog alerted on three checked suitcases that had not been planted by the agents. The suitcases were intermingled with domestic and international luggage in a baggage area underneath the American Airlines terminal. The Customs agents removed the suitcases from the baggage area and ran them through an airport x-ray machine. In the meantime the suitcases were identified as registered to a "Maria Torres" seated on board an American Airlines flight about to depart for Miami.

Customs Agent Marilyn Garcia boarded the plane and proceeded to the seat assigned to Maria Torres. The seat was occupied by a man and sitting next to him was the defendant, Maria De Los Santos Ferrer. Garcia approached the couple, identified herself as a Customs officer, and asked to see their airline tickets. The couple explained that they were married and produced airline tickets registered to "Anibal Torres" and "Maria Torres." De Los Santos Ferrer identified herself as Maria Torres. Affixed to her airline ticket were three baggage claim checks that corresponded to the claim checks on the suitcases picked out by the drug-detecting dog. The defendant and her husband were led off the airplane and taken to the Customs enclosure area, where they were put in separate rooms.

After the defendant was read her *Miranda* rights and patted down for weapons, Customs supervisor Benjamin Garcia asked De Los Santos Ferrer about the suitcases. The defendant replied that the luggage did not belong to her. An hour or more elapsed before Agent Enrique Nieves of the Drug Enforcement Administration arrived. He informed the defendant that a Customs dog had alerted authorities to the suitcases checked under her name, that the luggage had been x-rayed and that the x-ray revealed packages which Nieves believed contained narcotics.

Agent Nieves then asked for defendant's permission to open the suitcases, stating that he would obtain a search warrant if she did not consent. De Los Santos Ferrer again denied ownership, telling Agent Nieves that she could not consent to a search because the luggage was not hers. Nieves continued to seek the defendant's consent. This time (according to Nieves) she nodded her head in an affirmative manner. The luggage was then opened and found to contain cocaine, and the defendant was formally arrested.

De Los Santos Ferrer was indicted and thereafter she moved to suppress as evidence the cocaine found in the luggage. At a hearing on the motion before a magistrate judge, De Los Santos Ferrer admitted in her testimony that the suitcases belonged to her. She also agreed that she had disclaimed ownership of the luggage when questioned by Agent Benjamin Garcia and then again when questioned by Agent Nieves. But she denied that she ever consented to a search of the luggage. She testified that when the luggage was opened, Nieves did so using a tool.

The magistrate judge credited Agent Nieves' testimony on the issue of consent. The magistrate judge found that the defendant had voluntarily agreed to the opening of the suitcases, and he issued a written report to the district court recommending that the motion to suppress be denied. The defendant then sought review of the magistrate judge's recommended report. Based on the record of the earlier hearing, the district court reversed and ordered suppression of the cocaine seized from the luggage on two principal grounds.

First, the district court ruled that the x-ray examination, conducted for criminal investigation purposes without a warrant, violated the Fourth Amendment, and its use to secure consent vitiated the consent. Second, the court found that the disclaimer and the consent were involuntary because they were secured in a custodial "stationhouse" atmosphere in which the defendant was "detained for over an hour, not free to leave at will and subjected to a frisk" and to repeated interrogation. The court also criticized the agents for a pattern of abusive behavior in conducting warrantless airport searches based on x-ray checks and alleged consent.

■ In this appeal, the government primarily argues that the x-ray scan was not a search subject to the warrant requirement. It concedes that this x-ray examination was not a valid airport administrative search, *United States v. $124,570 U.S. Currency,* 873 F.2d 1240, 1244 (9th Cir.1989) (airport administrative search exception to warrant requirement is limited to searches for weapons and explosives), but it maintains that there is no reasonable expectation of privacy in luggage checked at an airport, at least as to x-ray searches. *See Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 517, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring). The government notes that luggage on the flight at issue in this case was also subject to an administrative search by the Agriculture Department.

We think that the Fourth Amendment issue is a difficult one. To be sure, a traveler who has any experience knows that luggage at airports is now commonly x-rayed for guns or explosives and that requests at the check-point to open the luggage are not uncommon. At the same time, these are administrative searches conducted for a limited purpose and this limited—and exigent—purpose has been the basis for allowing the searches en masse, without a warrant and without probable cause. There is at least some basis for concern about the government's falling-domino approach, by which each intrusion diminishes privacy expectations enough to permit a further infringement. *See Smith v. Maryland,* 442 U.S. 735, 740 n. 5, 99 S.Ct. 2577, 2580 n. 5, 61 L.Ed.2d 220 (1979).

In this case, the second search was by x-ray and probable cause to secure a warrant happened to exist; but it is not clear whether the government's diminished expectations theory would be limited to probable cause cases or, perhaps, even to x-ray searches. The government itself ought to give some thought to the fact that indiscriminate extensions of warrantless search authority may eventually undermine the case for legitimate exceptions. In all events, we see no reason to hurry to embrace the position urged by the government in this case, for we think that the search may be sustained on a quite different ground, namely, the defendant's own admitted disclaimer of an interest in the luggage. *See United States v. Maldonado–Espinosa,* 968 F.2d 101, 103–04 (1st Cir. 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1579, 123 L.Ed.2d 147 (1993).

It is well established that one who abandons or disclaims ownership of an item forfeits any claim of privacy in its contents, and that as to that person the police may search the item without a warrant. *E.g., United States v. Miller,* 589 F.2d 1117, 1131 (1st Cir.1978), *cert. denied,* 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979); *United States v. Torres,* 949 F.2d 606, 608 (2d Cir.1991) (collecting cases). In this case, defendant's own testimony at the hearing was that from the outset, and repeatedly, she told the agents that she could not give them authority to open the luggage because it was not hers. It would be hard to find a more explicit disclaimer or one more certain to have occurred.

■ The district court noted that Agent Nieves did not rely on the disclaimer but

rather continued to seek the defendant's consent to open the luggage. But there is no suggestion in the case law that law enforcement officials must actually believe a defendant who denies ownership, and indeed it is often the case that the disclaimer is immediately suspect. *E.g., United States v. Roman,* 849 F.2d 920 (5th Cir.1988) (agent saw defendant in possession of luggage prior to defendant's disclaimer of knowledge of bags); *United States v. Tolbert,* 692 F.2d 1041 (6th Cir.1982) (same), *cert. denied,* 464 U.S. 933, 104 S.Ct. 337, 78 L.Ed.2d 306 (1983). Obviously the agent would prefer to have "consent" since it carries with it an admission of control or ownership that could be useful at trial; but the agent's attempt to secure this more useful ground for the search (consent) does not seem to us to preclude reliance upon an equally well established one (disclaimer) made out by the facts.

■ Nor do we think that the disclaimer is undermined by the "nod" that defendant is alleged to have given—she denied it but the magistrate judge found that it had occurred—at the end of the interview. It may well be that, if a defendant disclaims ownership of a bag but then clearly reverses ground and asserts ownership, it is *too late* for the officer then to search the bag in reliance on the earlier, but now withdrawn, disclaimer of ownership. But in this case we do not think the simple nod, even if it occurred, was sufficiently at odds with the repeated disclaimer to require us to ignore the disclaimer.

■ Given the original disclaimer, it is unnecessary for us to rule on the government's argument that the later consent was voluntary, although we note that district court findings on such issues are not lightly set aside. The initial disclaimer is another matter: It occurred at the outset of the questioning well before Agent Nieves even arrived and before much time had passed. Assuming that the atmosphere became coercively oppressive, we see no evidence that this was so at the very outset. If the district court did mean that this disclaimer was secured by undue pressure, we cannot sustain that ruling.

■ Similarly, the allegedly unlawful x-ray had not been mentioned when the disclaimer was first made so there is no argument that it prompted, and thereby infected, the disclaimer. Nor is there any basis for believing that the x-ray was a but-for cause of the detention and that the detention would not have occurred without the x-ray search. The dog sniff, which is not itself a search, was lawful, *United States v. Place,* 462 U.S. 696, 707, 103 S.Ct. 2637, 2644–45, 77 L.Ed.2d 110 (1983), and the "alert"—by a certified, narcotics-detecting dog—provided probable cause to detain and ample incentive to question the holder of the claim checks for the luggage. *E.g., United States v. Race,* 529 F.2d 12, 15 (1st Cir.1976).

■ We have considered *sua sponte* whether *Murray v. United States,* 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988), warrants a remand for an evidentiary hearing on the causation issue. In *Murray,* the Supreme Court required such a hearing because the known facts left it in doubt whether a warrant-based search of a warehouse would have occurred without a prior unlawful search of the same facility by the same agents. In this case, the officer who made the decision to detain the defendant testified that she did not even know that an x-ray search had been performed when she took the defendant from the plane. That detention, the officer testified, was based upon the dog alert and match-up of claim check numbers.

Even without that testimony, we think that defendant's detention here was, beyond any reasonable dispute, inevitable regardless of the x-ray. The evidence was that the dog, who had worked with its handler for several years, "was biting and scratching on these suitcases" associated with the defendant. This, the handling officer testified, was the expected response when narcotics were present. According to the magistrate's report, the agents were in the process of determining the identity and location of the owner of the luggage at the same time the luggage was being x-rayed. The defendant, they learned, was on an airplane ready to depart from Puerto Rico. Without immediate action to detain her, the agents could fairly assume

that she would be gone from the jurisdiction. If the x-ray machine had been out of order, the outcome would have been identical.

■ Finally, we note that the district court was disturbed at a pattern it perceived of Customs and DEA conduct at the airport: of dog sniffs, followed by x-rays, followed by alleged consents to search. *See, e.g., United States v. Maldonado–Espinosa,* 767 F.Supp. 1176 (D.P.R.1991), *aff'd,* 968 F.2d 101 (1st Cir.1992). The district court underscored its unhappiness with this pattern of conduct, discussing it both at the beginning and the end of the opinion. So far as concerns the warrantless x-ray search for criminal enforcement purposes, we have expressed our doubts and declined in this case to adopt the government's position.

■ The pattern of alleged consents presents a quite different issue. While we appreciate the value of a probable cause decision by an independent magistrate, true consent is a well-founded basis for a search without a warrant, and the government is entitled to request consent from a suspect as a legitimate short cut. At the same time, it is one thing to request consent and another to seek it over and over again while—as occurred here—holding a defendant in temporary detention for well over an hour, with no indication of how long detention will continue, and with the DEA agent raising his voice to the detainee to tell her to be "respectful." When the consent is conveyed by a "nod," its worth is further diminished.

If this is the pattern of consent searches at the airport, we do not applaud it. More to the point, we think that the government should appreciate that claims of consent derived in this fashion are likely to be looked upon with a jaundiced eye by reviewing courts. If the government exerts undue pressure or improper means to secure consent, instead of obtaining a warrant as it can easily do, it is going to lose cases.

The suppression order is *reversed* and the case *remanded* for further proceedings.