# United States Court of Appeals
## For the First Circuit

---

No. 06-1979

UNITED STATES OF AMERICA,

Appellee,

v.

WAYNE SHELTON,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary M. Lisi, <u>Chief U.S. District Judge</u>]

---

Before

Howard, <u>Circuit Judge</u>,

Campbell, <u>Senior Circuit Judge</u>,

and Saris,<sup>*</sup> <u>District Judge</u>.

---

<u>James M. Fox</u>, for appellant.
<u>Donald C. Lockhart</u>, <u>Adi Goldstein</u>, Assistant United States
Attorneys, were on brief for appellee.

---

June 15, 2007

---

<sup>*</sup> Of the District of Massachusetts, sitting by designation.

**SARIS, District Judge**.

## I. INTRODUCTION

After a bench trial, defendant-appellant Wayne Shelton was convicted of aggravated bank robbery. On appeal, he challenges the district court's rejection of his insanity defense and the reasonableness of a bottom-of-the-range sentence of 262 months. After a thorough review of the record, we **AFFIRM**.

## II. FACTUAL BACKGROUND

### A. The Robbery

Wayne Shelton was indicted by a grand jury for bank robbery using force and violence in violation of 18 U.S.C. §§ 2113(a) and (d). Shelton waived his right to a jury trial. During the four-day bench trial, the government presented evidence of the following facts.

On August 11, 2004, the day before the robbery, Shelton "cased" the Bank Rhode Island in East Providence, a federally insured bank, by observing it from across the street for two hours. Just before the robbery, he again sat across the street watching the bank for in excess of two hours. Then, at about 3:00 p.m. on August 12, Shelton burst into the bank brandishing a pellet gun, which looked like a real handgun, and wearing a pair of sunglasses, a hat, and a bandana over his face. Pointing the gun, he methodically demanded large bills from each of the four tellers, who gave him $9,000. While stuffing the money into a duffle bag,

-2-

Shelton placed his gun down, but before fleeing the bank, he retrieved it. He placed the gun and his disguise into the duffle bag, then hopped onto a mountain bicycle.

A police officer, who had heard reports describing the bank robber, spotted Shelton on his bike several blocks from the bank, and ordered him to stop. Shelton ignored the command. Abandoning the mountain bike, Shelton continued to flee on foot. After chasing Shelton for two blocks, a second officer captured and arrested Shelton in a backyard, still holding the duffle bag with the money and the pellet gun. It was hot, and all were sweating and winded from the chase.

During the booking, Shelton initially refused to answer questions. Later, he identified himself with a false name and false date of birth. After arrival at the cell block, an officer requested an ambulance for Shelton to check on his well-being. En route to the hospital for medical attention in the ambulance, Shelton told the officer, "I will get away from you. I have done this in the past and I got away." Later that evening, he admitted his true name after being confronted by a police officer who recognized him.

## B. The Insanity Defense

Shelton presented an insanity defense. The defendant testified about his memory of the events on the day of the bank robbery as follows. He awoke to find himself sitting behind a

garage and didn't know why he was there. Thirsty and confused, he reached into his duffle bag to get a drink. Instead, when he opened his bag, he found money. At that exact moment, he was approached by a police officer. Startled, Shelton began to run, but he was tackled shortly thereafter by the officer and hit so hard he passed out, only to regain consciousness at a hospital. He has no memory of the robbery or of being at the police station.

Shelton offered evidence of his difficult life. His mother was murdered when he was only fifteen years of age. He said that he hears imaginary voices, particularly a female voice who "likes to start trouble" and chastise him, and that he has blacked out in the past while committing acts of vandalism and violence. Prior to his arrest for the bank robbery, he had been arrested and incarcerated twice for receiving stolen goods, and the police had wrongfully seized some items of his personal property (including a PlayStation video game device) during a search and refused to return them despite a court order to do so. During this prior interaction with the police, Shelton also had used an alias. Shelton admitted disliking the police for refusing to return his DVDs, PlayStation, and other items.

Defendant recounted two instances where he did something violent and then didn't remember. When he was thirteen and living in a group home, he broke a chair; on another occasion, he kicked his girlfriend's car door. Neither time did he remember the event

-4-

immediately afterwards.

## C.  **Expert Testimony**

Each side submitted expert testimony on Shelton's mental state.  Defense expert Dr. Ronald Stewart, a psychiatrist, reviewed records from the group homes Shelton had lived in as a child and reviewed the report of the government's psychiatric expert, Dr. Richard Frederick.  Dr. Stewart examined Shelton on two occasions. He concluded that the defendant suffered from a major depressive disorder with psychotic features (that is, auditory hallucinations), post-traumatic stress disorder, and dissociative reaction, all of which rendered him incapable of knowing the wrongfulness of his behavior on the date of the robbery.  Dr. Stewart's opinion was based, in large part, on Shelton's statements that he experienced auditory hallucinations, had no memory of the bank robbery, and had an extreme anger at the police due to the prior seizure of his "Gameboy" (a portable video game device) which was the "center of his universe."  Moreover, Dr. Stewart testified about Shelton's prior personal history, including the murder of his mother (who herself had schizophrenia, as did his two uncles); sexual abuse; physical beatings about the head by his father resulting in loss of consciousness; longstanding depression; and borderline intellectual functioning with an IQ of 86.  In Dr. Stewart's opinion, defendant was "not aware of the bank robbery as it was happening."  He testified that defendant was "so preoccupied

with the elements of his psychosis, which include auditory hallucinations, that though he may have been doing what appeared to be purposeful behavior, it is very unlikely that he had any understanding of the wrongfulness of his behaviors...."

Countering this testimony, the government introduced testimony from Dr. Richard Frederick, a clinical psychologist at the Medical Center for Federal Prisoners in Springfield, Missouri with an expertise in feigned psychopathology and cognitive impairments. Shelton arrived at Springfield in November and left in April. Dr. Frederick placed Shelton on medication designed to alleviate depression and psychotic symptoms. According to Dr. Frederick, Shelton's reaction to the medication was inconsistent with that of a patient actually suffering from the claimed conditions. For example, Shelton stated that his medication had no effect on his symptoms of depression and psychosis, though some reaction would normally be expected. When Shelton was discovered "cheeking," or not swallowing, his medication, treatment was discontinued. In another incident recounted by Dr. Frederick, Shelton exhibited a marked change in manner when allowed to speak to his sister over the telephone -- his energy level changed instantly. This observed ability to "turn it on and turn it off" suggested to Dr. Frederick that defendant was probably faking his symptoms.

Dr. Frederick's observations over those weeks and his review of other medical reports and witness statements from the

crime led him to conclude that Shelton suffered from a schizoid personality disorder, "which is not a major mental illness" and would not prevent him from appreciating the nature and quality of his actions. Dr. Frederick further opined that Dr. Stewart's diagnosis of dissociative disorder was unlikely, given that such a condition is both rare and "obvious to observers." For instance, dissociative disorder is characterized by a "vacant" stare, and while patients suffering with that condition may be able to engage in "well-learned repetitive behavior," they "won't be able to respond to a new situation." Shelton did not display a "vacant stare" and was observed engaging in purposeful behavior with a rational motive over the course of the robbery. Dr. Frederick characterized Shelton's claim that he didn't remember the robbery as absurd, pointing out that "the Defendant fails to recall only those matters that involve criminal behavior. Everything else he seems to be okay with." Dr. Frederick concluded that Shelton also did not suffer from post-traumatic stress disorder.

After pointing out that Dr. Stewart did not know defendant had cased the bank the day before or that he took the disguise off after the robbery, the district court discredited defendant's expert:

> He knew almost no facts about the actual robbery. He spent little time discussing it with the Defendant and stated that he assumed that the Defendant was telling him the truth when he claimed to have no memory of the bank robbery and of hearing voices.

> Dr. Stewart did not look at the police reports, the video of the robbery or any witness statements that would have given him a tremendous amount of detail as to the Defendant's actions on that day.
>
> And so, as I say, I find Dr. Stewart's opinion and diagnosis to be of no or little value in this case. It simply is not supported by the record facts.

By contrast, the court found Dr. Frederick's opinion regarding Shelton's mental state to be "credible, compelling," and "well based on the actual facts of [the] case." The court explained:

> The Defendant's watching the bank, casing the bank the day before the robbery, casing the bank again the day of the robbery, knowing enough to use a very good disguise, his choice of a weapon, a BB gun that looked exactly like a real semi-automatic, his deliberate and purposeful actions while in the bank, that is, going from teller to teller, knowing enough to go back and retrieve the gun from where he left it and then removing his disguise and secreting it within the bag when he left the bank.

In reaching this conclusion, the court emphasized that Dr. Frederick had formed his opinion after four months of observation of Shelton while incarcerated, whereas Dr. Stewart's examination occurred over a short period. The court concluded that Shelton failed to meet his burden of proving the defense of insanity by clear and convincing evidence. As such, the court found the defendant guilty of aggravated bank robbery.

**D. The Sentencing**

After his conviction, Shelton was sentenced to 262 months of incarceration on June 20, 2006. Shelton was a Career Offender with at least two prior convictions, including convictions for armed robbery using a shotgun, breaking and entering, and assault with a deadly weapon, which resulted in a calculation of 20 Criminal History Points under the advisory Sentencing Guidelines. The Presentence Report ("PSR") calculated his offense level at 34, which placed him in criminal history category VI. Based upon this calculation, which is not contested, Shelton faced an advisory sentencing range of 262 to 327 months. Shelton's counsel argued for a downward departure or variance from the advisory guideline range based on certain mitigating factors: Shelton's claimed mental illness, his status as a victim of sexual and physical abuse as a child, and his mother's murder when Shelton was only fifteen.

After discussing Shelton's family and psychological history at sentencing, the trial court remarked:

> In this case, the violence that is perpetrated by the Defendant, the decisions he makes to take firearms and point them at people, not just this one time but the history of him doing so, causes me in this case to decide that a sentence at the low end of the guidelines is what is necessary not only to protect the public but also to protect Mr. Shelton from himself and to accomplish those goals that are set forth in Section 3553.

While the court characterized defense counsel's argument for a discretionary downward departure as "eloquent," it nonetheless

determined that consistent with the goals of 18 U.S.C. § 3553, a low-end Guidelines sentence of 262 months was appropriate.

## III.  DISCUSSION

### A.  Insanity Defense

Shelton argues that the trial court erred by finding he failed to satisfy his burden of proving by clear and convincing evidence that he was unable to appreciate the nature and quality or the wrongfulness of his acts on the day of the robbery due to a severe mental disease or defect.

Normally, we review challenges to sufficiency of the evidence following bench trials "de novo, evaluating whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Melendez-Torres, 420 F.3d 45, 48-49 (1st Cir. 2005) (internal quotation omitted and citations deleted).  The standard of review must be stated differently for the insanity defense because it is an affirmative defense for which the defendant, not the government, has the burden of proof by clear and convincing evidence.  See 18 U.S.C. § 17(a) & (b) (1988).[1]

---

[1]    The Federal insanity statute, 18 U.S.C. § 17, provides:

(a) It is an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect,

-10-

In the context of the insanity defense, a reviewing court should reject the verdict "only if no reasonable trier of fact could have failed to find that the defendant's criminal insanity at the time of the offense was established by clear and convincing evidence." United States v. Barton, 992 F.2d 66, 68-69 (5th Cir. 1993). While a defendant making an ordinary sufficiency challenge faces a difficult hurdle, in an insanity case, the defendant's burden is "even greater" because at trial it is the defendant, not the government, that must carry the burden of proving insanity by clear and convincing evidence. United States v. Waagner, 319 F.3d 962, 964 (7th Cir. 2003).

As we have repeatedly emphasized, it is for the fact-finder to "decide among reasonable interpretations of the evidence." United States v. Batista-Polanco, 927 F.2d 14, 17 (1st Cir. 1991). A reviewing court should not re-weigh the credibility of witnesses. United States v. Hahn, 17 F.3d 502, 508 (1st Cir. 1994). It is well within the fact-finder's province to determine the weight accorded to expert witnesses. See Seahorse Marine

was unable to appreciate the nature and quality or the wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.

(b) The defendant has the burden of proving the defense of insanity by clear and convincing evidence.

Supplies, Inc. v. Puerto Rico Sun Oil Co., 295 F.3d 68, 81 (1st Cir. 2002) (citing Mitchell v. United States, 141 F.3d 8, 16-17 (1st Cir. 1998)).

As a preliminary matter, on appeal defendant has not challenged the sufficiency of the evidence to support the elements of the bank robbery charge against him. Thus the only question to be resolved on appeal is whether the trial court's decision that the defendant had not satisfied his burden proving his insanity under 18 U.S.C. § 17 by clear and convincing evidence was based on sufficient evidence. The district court gave less weight to the testimony of Dr. Stewart because, among other things, he conducted only two interviews of the defendant; assumed that Shelton was being truthful when he described his memory of events on the day of the robbery; admitted that he knew little about the facts of the robbery; and failed to evaluate his medical diagnosis in light of the facts surrounding the bank robbery, including Shelton's use of a disguise, his surveillance of the bank, and the defendant's decision to carry a gun.

Defendant argued that the court failed to apply the same level of scrutiny to each party's expert. He emphasizes that the government's expert did not conduct an exhaustive investigation to learn about the robbery. However, while the government expert made efforts to review the bank robbery witness statements, the defendant's expert did not even look at defendant's rap sheet,

recall reading any police reports or witness statements, interview any witnesses, review the medical records from the day of the robbery, or interview anyone who had a first-hand impression of what the defendant was like on the day of the offense.  Instead, his primary source of information about defendant's state of mind on the day of the robbery was the defendant, who Dr. Stewart assumed was telling the truth.  The court fairly weighed Dr. Stewart's limited knowledge of the facts of the case in assessing the credibility of the defense expert.  Batista-Polanco, 927 F.2d at 22.

In contrast, the court determined that Dr. Frederick's diagnosis and opinion were credible.  The court believed that the expert witness's opinion was strengthened because he had observed the defendant over the course of several months, conducted a battery of tests on the defendant, and thoroughly observed his interactions with others in the prison.  In the court's view, Dr. Frederick's opinion that Shelton was feigning his dissociative disorder was rooted to the facts of the instant case, because Shelton's decision to case the bank, wear a disguise, plan an escape route on a bicycle, and carry a weapon indicated that "he knew exactly what he was doing when he robbed Bank RI on August 12, 2004."

Shelton has fallen short of his burden of proving that no reasonable trier of fact could have failed to find that the

defendant's insanity at the time of the offense was established by clear and convincing evidence. We therefore affirm Shelton's conviction.

## B.  The Sentence

Shelton also challenges the court's sentence as unreasonable. Importantly, Shelton does not assert that the district court erred in calculating the advisory range, nor does he argue that the court's refusal to depart or vary was based on a misunderstanding or misapplication of the law. Rather, he argues, "when the nature of the offense is balanced against his diminished mental capacity and tragic personal history, the factors outlined in § 3553(a) warrant a lesser sentence." Essentially, defendant complains that the district court did not reasonably weigh the factors made relevant by 18 U.S.C. § 3553(a).

In the aftermath of United States v. Booker, 543 U.S. 220 (2005), which deemed the Sentencing Guidelines advisory, this court will review a trial court's sentence for reasonableness, regardless of "whether the actual sentence falls inside or outside the sentencing guideline range." United States v. Pelletier, 469 F.3d 194, 203 (1st Cir. 2006) (citing United States v. Turbides-Leonardo, 468 F.3d 34, 40-41); see also United States v. Jiménez-Beltre, 440 F.3d 514, 517 (1st Cir. 2006) (en banc) (holding that Booker establishes that "sentences would be reviewable for reasonableness whether they fell within or without

-14-

the guidelines."). In this review for reasonableness, "the sentencing guidelines, though advisory, remain an important datum in constructing a reasonable sentence. Consequently, a defendant who attempts to brand a within-the-range sentence as unreasonable must carry a heavy burden." Pelletier, 469 F.3d at 204 (citations omitted).

Here, defendant argues that the court undervalued the weight that should have been accorded his diminished capacity and tragic personal history. The record demonstrates the court took into account these mitigating factors of his "disturbing" family and psychological history, but found that his history of violence outweighed them. While the sentence is high, it is at the bottom of the range, and the court gave a reasonable explanation, including the point that the sentence was needed to protect the public. Given defendant's history of extremely "dangerous behavior" and the court's finding that defendant knew full well what he did, the overall sentence is defensible. See Jiménez-Beltre, 440 F.3d at 518-19. The sentence is affirmed.

## IV. CONCLUSION

The judgment of the United States District Court for the District of Rhode Island is **AFFIRMED**.