# United States Court of Appeals
## For the First Circuit

No. 13-1108

UNITED STATES,

Appellee,

v.

CHARLES FERMIN,

Defendant, Appellant.


APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. William E. Smith, U.S. District Judge]


Before

Lynch, Chief Judge,
Stahl and Barron, Circuit Judges.

Charles W. Rankin with whom Audrey M. Grace, Kerry A. Haberlin, and Rankin & Sultan were on brief, for appellant.
Donald C. Lockhart, Assistant United States Attorney, with whom Peter F. Neronha, United States Attorney, was on brief, for appellee.

November 14, 2014

**STAHL, <u>Circuit Judge</u>**.  After a jury trial, Defendant-Appellant Charles Fermin was convicted of possession with intent to distribute both marijuana and cocaine, and acquitted of possession of a firearm in furtherance of a drug-trafficking offense.  On appeal, Fermin contests the denial of his motion to suppress and the sufficiency of the trial evidence, and alleges error in the jury instructions and sentence enhancements imposed.  Finding no reversible error, we affirm Fermin's convictions and sentence.

## I.  Facts & Background

Because Fermin challenges the sufficiency of the evidence on appeal, we set forth the evidence in the light most favorable to the jury verdict.  <u>United States</u> v. <u>Clemens</u>, 738 F.3d 1, 3 (1st Cir. 2013).

On January 6, 2012, members of the High Intensity Drug Trafficking Area task force ("HIDTA task force"), a unit of the Rhode Island State Police, were conducting surveillance near the Providence College campus.  Fermin was observed walking down residential Liege Street empty-handed, wearing a garbage bag underneath a red sweatshirt, before disappearing out of sight between two houses, 40 and 48-50 Liege Street.  He emerged three to four minutes later rolling a large black suitcase.

Looking around as if to check if anyone was walking behind him, Fermin wheeled the suitcase the same way he had just come and entered a nearby parking lot.  He made his way to the far

end of the lot, where he placed the suitcase between a Jeep and a cement wall. He then stepped away from the suitcase and began to talk on a cell phone. Between conversations, he slid the suitcase under the Jeep and removed the sweatshirt he was wearing. Several minutes later, Fermin retrieved the suitcase, tied his sweatshirt around the handle, and exited the parking lot with the suitcase in tow.

Police stopped Fermin on the street shortly thereafter and asked to speak with him about the suitcase. Fermin immediately dropped his cargo and said that it was not his. He told police that he had been running at the Providence College track when someone threw the suitcase over the fence.[1] Standing next to the suitcase, one detective discerned a "strong odor" of marijuana; he unzipped the suitcase and saw that it did in fact contain a large quantity of marijuana. Fermin was arrested and transported to the police barracks.

While being interviewed at the barracks, Fermin reiterated that he happened upon the suitcase while running at the Providence College track, after someone threw it over the fence. Fermin also volunteered to the detective processing him that he and his friend saw someone "dump" the suitcase near the Providence College track; his friend had encouraged him to take the bag,

---

[1] A Providence College security guard testified at trial that there is no outdoor track on campus.

believing there might be money in it. He declined to identify his friend, stating that the friend was "a college white boy and you know how they are." The detective later presented Fermin with surveillance photographs taken earlier that day, both before and after he had retrieved the suitcase, which depicted him walking down the street alone. Fermin became visibly upset and said that he did not want to argue.

Police recovered thirty-three pounds of marijuana from the suitcase, stored in thirty-eight gallon-sized clear plastic bags;[2] thirty-one grams of cocaine; a bottle of powdered caffeine;[3] three digital scales; and a box of plastic bags like the ones filled with marijuana. In addition, the suitcase contained a .357 revolver loaded with six rounds of ammunition inside a rolled-up pair of sweatpants.

A three-count indictment issued against Fermin, charging him with possession of marijuana with intent to distribute, possession of cocaine with intent to distribute, and possession of a firearm in furtherance of those crimes. Fermin unsuccessfully moved to suppress all evidence seized by law enforcement personnel

---

[2] Twenty-one fingerprints were found on the bags of marijuana. Neither of the two prints that could be traced to a specific person belonged to Fermin.

[3] A detective testified at trial that narcotics traffickers use caffeine to cut and add bulk to cocaine, in order to sell more of the drug.

-4-

on January 6, 2012, as well as all statements he made to police that day.

After a three-day trial, Fermin was convicted of the two drug charges but acquitted of the firearm charge.[4] Applying sentence enhancements for obstruction of justice and possession of a firearm during the commission of the crimes, the district court sentenced Fermin to forty-one months in prison. This appeal followed.

## II. Analysis

A. Motion to suppress

### 1. Evidence at the motion hearing and district court's ruling

The district court held a hearing on the motion to suppress, at which Fermin and two detectives, Allen and Demers, testified. The detectives' testimony at the hearing concerning their January 6 surveillance of Fermin tracked their eventual trial testimony. However, Detective Allen also gave details, not placed before the jury, of a tip received from a reliable confidential informant two days prior to Fermin's stop. The informant told police that 40 Liege Street was being used as a "stash house" for large amounts of marijuana, approximately 1000 or 1500 pounds, and that the stash was to be relocated soon. Acting on the tip, task

---

[4] Defense counsel moved for a judgment of acquittal, arguing that the evidence was insufficient to convict on all counts. The district court denied the motion.

force members conducted surveillance of the area on January 4 and 5. They observed vehicles pulling up in front of 40 Liege Street and one or more people entering the house at a time, leaving a short time later. Such activity, Detective Allen believed, was consistent with narcotics trafficking.

Fermin's account of the ensuing stop on January 6 contradicted that of the detectives. Fermin testified that he was jogging in the area when he found the suitcase next to a recycling bin in someone's backyard. Picking it up and noting its substantial weight, Fermin became curious as to its contents, but did not want to open it while on the potential owner's property. He decided to take the suitcase to the Chad Brown housing project, where "people mind their business," resolving to throw it out there if it contained nothing of value.

According to Fermin, he was wheeling the suitcase down the street when a car sped by and abruptly came to a stop ahead of him. An officer emerged, pointing a gun at him, and commanded him to stop. Fermin immediately let go of the suitcase. Another officer exited a different car, also with her gun drawn; the two converged on Fermin as a third officer approached him with handcuffs. In response to their questioning about the suitcase,

Fermin told police that he had just found it in someone's yard and that it did not belong to him.[5]

Detective Demers testified that he parked on the street next to Fermin and displayed his badge — but not his gun — as he exited the vehicle, stating, "State Police. State Police task force. We want to talk to you regarding the suitcase you're carrying." In response, Fermin put his hands up and dropped the suitcase, declaring that it was not his and that he had found it while running at the Providence College track. Immediately thereafter, Detective Allen arrived on the scene and parked his car, with the front of his car facing both Detective Demers and Fermin. Two other officers also arrived and stood behind Fermin.

Detective Allen asked questions of Fermin in what he described as a "conversational" tone of voice; he denied giving any commands or drawing his gun. Allen placed Fermin in handcuffs once marijuana was discovered in the suitcase and transported him to the police barracks.

Crediting the detectives' version of events over Fermin's, the district court ruled that the encounter was a consensual one that did not implicate the Fourth Amendment. Further, the warrantless search of the suitcase was proper, as

_____

[5] Fermin testified that he told police that he had been running on the Providence College campus, but that when police asked him whether he was running on the track, he told them that there was no track there.

Fermin had disclaimed ownership of it and thus forfeited a claim of privacy.  See United States v. De Los Santos Ferrer, 999 F.2d 7, 9-10 (1st Cir. 1993).  The court held in the alternative that, even if the encounter constituted a seizure for Fourth Amendment purposes, police had reasonable suspicion, supported by articulable facts, that criminal activity might have been afoot.  The court therefore denied Fermin's motion to suppress.

### 2. Discussion

"When reviewing a challenge to the district court's denial of a motion to suppress, we view the facts in the light most favorable to the district court's ruling on the motion, and we review the district court's findings of fact and credibility determinations for clear error."  United States v. Camacho, 661 F.3d 718, 723 (1st Cir. 2011) (internal citations and quotation marks omitted).  However, we review conclusions of law de novo, giving plenary review to the district court's application of law to facts, reasonable-suspicion determinations, and ultimate decision to deny the motion.  Id. at 724.

The question whether the encounter at issue was consensual, or instead a seizure within the meaning of the Fourth Amendment, is not free from doubt.  The district court found that it was "undisputed that there were . . . at least four, if not five officers present in some formation around [Fermin] in a very short period of time after he was confronted," and that police told

Fermin that they wanted to speak with him about the contents of the suitcase. It is not clear that a reasonable person, surrounded by five police officers, would believe that he was free to leave. See California v. Hodari D., 499 U.S. 621, 627-28 (1991). Indeed, Fermin did not leave but rather submitted to police authority by answering questions about the suitcase. See United States v. Holloway, 499 F.3d 114, 117 (1st Cir. 2007) (citizen's submission to show of police authority is a prerequisite for a finding of seizure).

We need not decide the question, however, because Fermin's stop was supported by reasonable suspicion in any event. See United States v. Espinoza, 490 F.3d 41, 46 (1st Cir. 2007) (brief investigatory stops can be grounded on reasonable suspicion, as opposed to probable cause). Police had "a particularized and objective basis for suspecting [Fermin] of criminal activity." Ornelas v. United States, 517 U.S. 690, 696 (1996) (alteration, citations, and internal quotation marks omitted).

Acting on a tip from a confidential informant that the house at 40 Liege Street was a repository for a large amount of marijuana, police observed comings and goings from the house consistent with drug trafficking. See United States v. Jones, 700 F.3d 615, 621 (1st Cir. 2012) ("Information provided to police by third parties may create reasonable suspicion if the information contains sufficient 'indicia of reliability.'" (quoting Alabama v.

-9-

White, 496 U.S. 325, 328 (1990))).  This is not a case where the detectives' suspicion was based on Fermin's mere presence in a high-crime area known for drug activity.  Cf., e.g., Camacho, 661 F.3d at 726-27.  The tip and surveillance, combined with Fermin's deliberate path toward 40 Liege Street, his disappearance between houses and reemergence with the suitcase shortly thereafter, and subsequent attempt to keep the suitcase out of sight by hiding it under a Jeep, together constituted "specific and articulable facts" justifying the belief that Fermin was engaged in criminal activity. United States v. Rabbia, 699 F.3d 85, 89-90 (1st Cir. 2012) (quoting United States v. Brake, 666 F.3d 800, 804 (1st Cir. 2011); cf. United States v. Velez-Saldana, 252 F.3d 49, 52 (1st Cir. 2001) (police had reasonable suspicion to stop defendant after seeing him emerging from area where large shipment of drugs recently had been seized); United States v. Moore, 235 F.3d 700, 703-04 (1st Cir. 2000) (officers had reasonable suspicion to conduct stop after defendant ran out of apartment in building where they "had just observed significant foot traffic suggesting ongoing drug sales," and defendant attempted to hide something from officers).  The stop was thus permissible, as was the search of the suitcase following Fermin's disclaimer of ownership.  See De Los Santos Ferrer, 999 F.2d at 9-10.  The district court properly denied the motion to suppress.

B.   Sufficiency of the evidence

At trial, the government proceeded on alternative theories in support of Fermin's guilt, arguing that he either had actual knowledge of what was in the suitcase, or else purposely avoided learning of the contents.  See United States v. Appolon, 695 F.3d 44, 64 (1st Cir. 2012) (noting that theories of actual knowledge and willful blindness "can coexist" (quoting United States v. Griffin, 524 F.3d 71, 79 (1st Cir. 2008))).  Over defense counsel's objection, the district court instructed the jury that they could infer that Fermin acted knowingly if it found "that he deliberately closed his eyes to a fact that otherwise would have been obvious to him."

Fermin argues on appeal that the willful-blindness instruction was unwarranted where there were no "facts suggest[ing] a conscious course of deliberate ignorance."  United States v. Azubike, 564 F.3d 59, 66 (1st Cir. 2009).  He further contends that the evidence at trial was insufficient, under either theory, to establish that he knew that the suitcase contained drugs.

"We review preserved challenges to the sufficiency of the evidence de novo."  Id. at 64.  "In assessing sufficiency, we examine the evidence, both direct and circumstantial, in the light most favorable to the prosecution . . . , including all plausible inferences drawn therefrom." United States v. Cruz-Rodríguez, 541 F.3d 19, 26 (1st Cir. 2008).  "If, in this light, any reasonable

-11-

jury could find all the elements of the crime beyond a reasonable doubt, we must uphold the conviction." United States v. Lizardo, 445 F.3d 73, 81 (1st Cir. 2006).

We consider first whether there was sufficient evidence that Fermin actually knew of the drugs in the suitcase. It is worth noting at the outset that key evidence tending to establish Fermin's mens rea was not before the jury, namely, the tip that 40 Liege Street was a drug "stash house" and the detectives' subsequent surveillance of the area. Without this evidence, the case against Fermin is a closer one. However, after a full review of the transcript, we conclude that there was nonetheless sufficient evidence to support Fermin's convictions on a theory of actual knowledge.

There was evidence before the jury of Fermin's purposeful behavior in retrieving the suitcase from the 40 Liege Street area. Fermin walked, empty-handed, towards the rear of 40 and 48-50 Liege Street. Witnesses testified that he emerged with a "bulging" suitcase three to four minutes later and walked back the way he had come, looking over his shoulder "as [if] to check if anyone was walking behind him." Fermin then tried to hide the suitcase next to and under a Jeep while he talked on his cell phone. Cf. United States v. Ortiz, 23 F.3d 21, 25 (1st Cir. 1994) (defendant's entry into a condominium complex empty-handed, emergence with a black bag, and placing of the bag into car trunk supported a rational

-12-

inference that defendant knew that the bag contained cocaine). This evidence is probative of Fermin's deliberate conduct and distinguishes the case from others involving defendants who happened to be in the wrong place at the wrong time. See, e.g., United States v. Valerio, 48 F.3d 58, 64-65 (1st Cir. 1995) (evidence insufficient to support conviction of knowing possession of cocaine with intent to distribute where drugs were found in lining of chair in apartment of which defendant was short-term occupant).

Further, the jury could infer Fermin's knowledge of his cargo from his nervous behavior and attempts to conceal the suitcase, as well as from the odor of marijuana emanating from the suitcase. See United States v. De Jesús-Viera, 655 F.3d 52, 60 (1st Cir. 2011) ("Testimony regarding [the defendant's] nervous behavior . . . was also supporting evidence of guilt."); Azubike, 564 F.3d at 65 ("attempts at secrecy" demonstrative of defendant's knowledge that briefcase with which he was entrusted contained heroin); United States v. de Leon Davis, 914 F.2d 340, 342 (1st Cir. 1990) (strong odor of glue emanating from suitcase, used to avoid detection of drugs, supported inference of knowing participation in drug trafficking).

The jury also could have found that Fermin gave more than one demonstrably false account of how he found the suitcase, explaining first that someone threw it over the fence while he was

-13-

running at the Providence College track, and later that he and his friend had found it together and that the friend had encouraged him to take it. Unfortunately for Fermin, a lieutenant at the school's Office of Safety and Security testified at trial that there is no outdoor track on campus; surveillance photographs also depicted Fermin alone — on a residential street, not on the college campus — both immediately before and after retrieving the suitcase. Thus, Fermin's "knowingly false statement[s were] probative of [his] consciousness of guilt." United States v. Littlefield, 840 F.2d 143, 149 (1st Cir. 1988).

Finally, there was testimony at trial that the wholesale value of the drugs in the "heavily packed" suitcase was up to $51,200, with the retail value being double that amount. The quantity of drugs possessed provides a basis from which to infer knowledge. See De Jesús-Viera, 655 F.3d at 60; Azubike, 564 F.3d at 65; United States v. Ayala-Tapia, 520 F.3d 66, 68 (1st Cir. 2008). Thus, viewing the evidence in the light most favorable to the government, a reasonable jury could find that Fermin had actual knowledge of the contents of the suitcase.[6]

---

[6] Although Fermin takes issue only with the government's evidence as to the knowledge element, we note that there was sufficient evidence of his intent to distribute, too. Such intent could be inferred from the quantity of drugs possessed, as well as from the possession of drug paraphernalia such as digital scales and plastic baggies. United States v. Cortés-Cabán, 691 F.3d 1, 35-36 & nn.37, 41 (1st Cir. 2012).

-14-

Given this conclusion, we need not reach the question "whether the record evidence reveals flags of suspicion that, uninvestigated, suggest willful blindness," such that the willful-blindness instruction was warranted. United States v. Epstein, 426 F.3d 431, 440 (1st Cir. 2005) (internal quotation marks omitted). Although the warning signs of criminal activity were perhaps less conspicuous than in other cases where such an instruction properly was given, e.g., Lizardo, 445 F.3d at 85, any error in the decision to give the instruction was harmless in light of the ample evidence of Fermin's actual knowledge. United States v. García-Pastrana, 584 F.3d 351, 379 n.36 (1st Cir. 2009) (error in giving willful-blindness instruction harmless where evidence is sufficient to support defendant's direct knowledge of criminal activity).

Moreover, because the court's "instruction, taken as a whole, [could not] be misunderstood as mandating an inference of knowledge," Azubike, F.3d at 66, there was no danger that the jury convicted based on an impermissibly low standard, see United States v. Brandon, 17 F.3d 409, 453 (1st Cir. 1994). The district court cautioned the jury,

> It is entirely up to you to determine whether [Fermin] deliberately closed his eyes to [a] fact and, if so, what inference if any should be drawn from that fact. However, it is important to bear in mind that mere negligence or mistake or ignorance in failing to learn a fact is not sufficient. There must be a deliberate effort to remain ignorant of the fact. If after considering all of the evidence you have a reasonable doubt that

-15-

> [Fermin] acted with the requisite culpable
> state of mind, then you must find [Fermin] not
> guilty.

Cf. Littlefield, 840 F.2d at 148 (court's instruction did not mandate inference of knowledge where it explained to jury that defendant's mere negligence would be insufficient to establish guilt). "Thus, there was little risk that the jury was confused into convicting a defendant who merely should have known about the criminal venture." Brandon, 17 F.3d at 454.

C. Jury instructions

Fermin next argues that the district court's jury instruction regarding the consideration of expert testimony was erroneous. In particular, he takes issue with the court's admonition that, due to expert witnesses' "specialized knowledge," their opinions should be "carefully consider[ed]" and "should not be disregarded lightly." Fermin asserts that this instruction effectively directed the jury to defer to Detective Allen, who opined that the quantities of marijuana and cocaine found in the suitcase were consistent with distributive intent, rather than personal use.[7]

---

[7] To the extent that Detective Allen testified based on his experience handling hundreds of narcotics investigations and drug seizures over twenty-three years, his testimony appears to have constituted "specialized knowledge" within the meaning of Federal Rule of Evidence 702, which governs expert witnesses. Cf. United States v. García-Morales, 382 F.3d 12, 19 (1st Cir. 2004) (where agent had "participated in between 20 to 40 narcotic investigations and 40 to 60 drug seizures," his "professional background provided him with sufficient experience to explain the structure and

Because Fermin did not object to this instruction, our review is for plain error.  See Fed. R. Crim. P. 30(d); United States v. Medina-Martinez, 396 F.3d 1, 8 (1st Cir. 2005).  "When applying the plain error standard in the context of jury instructions, we look at the instructions as a whole to ascertain the extent to which they adequately explain the law without confusing or misleading the jury."  United States v. Brown, 669 F.3d 10, 29 (1st Cir. 2012) (internal quotation marks omitted).

It is the province of the jury to determine the proper weight to assign to expert testimony.  United States v. Shelton, 490 F.3d 74, 79 (1st Cir. 2007).  Testimony is not entitled to deference simply because it derives from an expert.  See United States v. Pires, 642 F.3d 1, 12 (1st Cir. 2011).  Indeed, jurors often are reminded to "consider the factors that generally bear upon the credibility of a witness" when weighing expert testimony. Pattern Criminal Jury Instructions for the District Courts of the First Circuit § 2.07.[8]

Although the district court errantly advised the jury that expert testimony "should not be disregarded lightly," the instruction in its entirety apprised the jury of its proper role vis-à-vis expert witnesses.  The court told the jury that it was

operation of a typical drug conspiracy.").

    [8] We note, however, that the pattern instructions are "precatory, not mandatory."  United States v. Gomez, 255 F.3d 31, 39 n.7 (1st Cir. 2001).

not required to accept an opinion just because a witness has specialized knowledge, that it should measure the credibility of expert witnesses by the same standard applicable to other witnesses, and that expert opinions "are not necessarily determinative or conclusive."[9]  Separately, the court also cautioned against giving special weight to law-enforcement testimony.  These multiple warnings were sufficient to offset any potential confusion, and the instruction as a whole was not plainly erroneous.  Cf. Brown, 669 F.3d at 30 (although certain language in instruction was "ambiguous in the abstract, the rest of the jury

---

[9] The district court instructed the jury as follows:

> During the trial, you heard testimony from several witnesses who claim to have specialized knowledge in a technical field.  These witnesses are sometimes referred to as expert witnesses.  And because of their specialized knowledge, they are permitted to express opinions which may be helpful to you in determining the facts.
> Since they do have specialized knowledge, the opinions of expert witnesses, whether expressed personally or in documents which have been admitted into evidence, should not be disregarded lightly.  On the other hand, you are not required to accept such opinions just because the witness has specialized knowledge.
> In determining the weight to give to the testimony of a so-called expert witness, you should apply the same tests of credibility that apply to the testimony of any other witness.  That is, the opportunity to observe the facts about which he testified, his apparent candor or lack of candor, and you may take into account the witness's qualifications, especially in comparison to any qualifications of any expert witness who expressed contrary opinions, and the accuracy of the facts upon which the witness's opinions are based.
> So in short, you should carefully consider the opinions of expert witnesses, but they are not necessarily determinative or conclusive.

instruction lent content to it," such that jury was not led astray); United States v. Nishnianidze, 342 F.3d 6, 16 (1st Cir. 2003) (finding no plain error in jury instruction where district court initially misstated element of crime but later clarified nature of government's burden).

D. Sentencing

Fermin argues that resentencing is required because the district court imposed two unsupported sentence enhancements and also improperly penalized him for exercising his right against self-incrimination. We consider each objection in turn, reviewing the court's legal conclusions de novo and factual conclusions for clear error. United States v. Gonzalez, 609 F.3d 13, 20 (1st Cir. 2010).

1. Obstruction-of-justice enhancement

A sentencing court is authorized to enhance a defendant's offense level by two levels if the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice." U.S. Sentencing Guidelines Manual § 3C1.1. Such an enhancement may be premised on a finding that the defendant committed perjury during the course of the investigation, prosecution, or sentencing. Id. cmt. n.1; United States v. Maguire, 752 F.3d 1, 5 (1st Cir. 2014). The court must make an independent finding, by a preponderance of the evidence, that the elements of perjury have been satisfied before imposing the

enhancement. Gonzalez, 609 F.3d at 20. "Perjury consists of false testimony under oath concerning a matter material to the proceeding, as long as the testimony is given 'with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.'" United States v. Shinderman, 515 F.3d 5, 19 (1st Cir. 2008) (quoting United States v. Dunnigan, 507 U.S. 87, 94 (1993)).

Here, the district court imposed a two-level enhancement for obstruction of justice after concluding that Fermin had perjured himself during the suppression hearing. The court found that Fermin's testimony was "a tale spun to attempt to get [the court] to suppress the evidence," and that it was "clearly false," both "in its specifics and . . . in a general overall sense." In particular, the court found untruthful Fermin's account of discovering the suitcase, his denial that he ever told police that he found it while running on the track at Providence College, and his assertion that police stopped him with weapons drawn.

The district court's finding that Fermin willfully lied in an attempt to have evidence against him suppressed is a factual one that we review for clear error. Gonzalez, 609 F.3d at 20. We cannot say that the finding was clearly erroneous. Fermin's testimony about the circumstances of finding the suitcase and subsequent stop by police directly conflicted with that of the other two witnesses, who the court determined to be more credible.

Cf. United States v. Meada, 408 F.3d 14, 25 (1st Cir. 2005) (finding of perjury not clearly erroneous where defendant's testimony "conflicted with several other witnesses"). "This was no garden-variety testimonial conflict about a peripheral matter but, rather, a head-on clash about a central issue" at the heart of the motion to suppress. Shinderman, 515 F.3d at 19. As the district court noted, Fermin's disavowal of having told police that he was running at the track also was belied by police reports that recorded such statement after the fact.

Fermin contends that the district court failed to make the requisite finding that his false testimony concerned a matter material to the suppression hearing. But insofar as his testimony was relevant to whether police had reasonable suspicion to conduct the stop and whether that stop constituted a seizure, it was "obviously material." United States v. Campbell, 61 F.3d 976, 984 (1st Cir. 1995) (affirming application of obstruction-of-justice enhancement where district court "applied the correct legal test for perjury" but did not make explicit materiality finding, noting that "court of appeals can make materiality determination absent express district court finding"). The enhancement was proper and not clearly erroneous.

2. Gun enhancement

Fermin also disputes the two-level enhancement imposed under U.S.S.G. § 2D1.1(b)(1). That guideline applies if a

dangerous weapon was possessed during the course of a drug-trafficking offense, provided that the presence of the weapon was known to, or reasonably foreseeable to, the defendant. United States v. Quiñones-Medina, 553 F.3d 19, 23 (1st Cir. 2009).[10] The commentary to the guideline notes that "[t]he enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1 cmt. n.11(A); see also United States v. Thongsophaporn, 503 F.3d 51, 58 (1st Cir. 2007). Fermin argues that there was insufficient evidence that he knew or could have reasonably foreseen the presence of the gun in the suitcase, particularly where the jury acquitted him of the firearm charge.

Although we are mindful that the jury acquitted Fermin of the firearm charge, it remains the law in this Circuit that acquitted conduct can form the basis of a sentence enhancement. United States v. Gobbi, 471 F.3d 302, 314 (1st Cir. 2006). While the jury must, of course, find facts beyond a reasonable doubt, a preponderance-of-the-evidence standard applies to the sentencing court's factual findings. Id. Further, there is no necessary inconsistency between acquittal on charges of "knowing" possession

---

[10] The "reasonably foreseeable" standard applies in cases of joint criminal ventures, irrespective of whether the venture has been charged as a conspiracy. U.S. Sentencing Guidelines Manual § 1B1.3(a)(1)(B); United States v. Thongsophaporn, 503 F.3d 51, 58 & n.8 (1st Cir. 2007).

of a firearm and the court's finding that the presence of the gun was "reasonably foreseeable" to Fermin.

Here, the district court determined that Fermin either was moving his own suitcase or that he was moving it at the behest of another person. If the former was true, the court found that "it was absolutely clear that it was more likely than not he knew that the firearm was present in the suitcase." If, on the other hand, the latter was true, the court found that Fermin had been entrusted with $50,000 worth of drugs; someone in his position, relied upon to transport drugs of such value, could be expected to be familiar with the trade and foresee the coincidence of guns and drugs. The court thus concluded that, regardless of which scenario prevailed, it was more likely than not that Fermin "knew of and/or could reasonably foresee the presence of [the] firearm." This finding was warranted and not clearly erroneous, in light of evidence of Fermin's knowledge of the drugs in the suitcase, and case law recognizing that such knowledge makes the presence of guns reasonably foreseeable.[11] See, e.g., United States v. Bianco, 922 F.2d 910, 912 (1st Cir. 1991) (affirming application of firearm enhancement and noting that "we often observe that firearms are

---

[11] We note also that, as discussed above, the district court had before it evidence of an ongoing drug operation that was not presented to the jury: the confidential informant's tip, corroborated by police, that the house at 40 Liege Street was being used as a "stash house" for large quantities of marijuana, which was to be relocated shortly.

common tools of the drug trade." (citing <u>United States</u> v. <u>Jackson</u>, 918 F.2d 236, 240 (1st Cir. 1990), <u>United States</u> v. <u>Walters</u>, 904 F.2d 765, 769 (1st Cir. 1990))).

### 3. <u>Alleged penalty for Fermin's exercise of right against self-incrimination</u>

Finally, Fermin argues that he was penalized during sentencing for having exercised his constitutional right against self-incrimination. Specifically, Fermin contends that the district court improperly focused on his refusal to admit knowledge of the contents of the suitcase, drawing an adverse inference from the refusal and meting out a harsher sentence as a result. Because Fermin did not raise this objection below, our review is for plain error. <u>United States</u> v. <u>Paladin</u>, 748 F.3d 438, 452 (1st Cir. 2014).

In short, the record does not bear out Fermin's assertion. Toward the end of the sentencing hearing, the district court discussed a letter that Fermin had sent to the court following trial, in which he voiced regret for taking the suitcase but still maintained that he had not known of its contents. The court did not focus on Fermin's silence, but rather on the version of events he articulated during the suppression hearing and again in the letter, expressing skepticism at his insistence that he did not know what was in the suitcase. However, the court did not translate this skepticism into an additional sentence enhancement; in fact, the forty-one-month sentence Fermin ultimately received

was at the lowest end of the guideline range for his offense level.[12]   There is no indication that the court imposed a more severe penalty as a result of Fermin's failure to admit that he knew what was in the suitcase.

## III.  Conclusion

For the foregoing reasons, Fermin's convictions and sentence are <u>AFFIRMED</u>.

---

[12] It is evident from the transcript of the sentencing hearing that the district court was mindful of the factors to be considered under 18 U.S.C. § 3553(a).